OPINION {¶ 1} This matter is before the Court on the Notice of Appeal of Thomas E. Carter, filed September 26, 2006. On August 23, 2006, a Montgomery County, Ohio, jury found Carter guilty of aggravated vehicular homicide (driving under suspension), a felony of the first degree, and vehicular homicide (driving under suspension), a felony of the fourth degree. The trial court merged count one *Page 2 
and count two for sentencing and imposed a term of seven years imprisonment.
 {¶ 2} The events giving rise to this matter began on May 13, 2003, when Carter and Ellen Hughes were traveling east in Hughes' car on Springfield Street, near Smithville Road, in Dayton, Ohio. Carter, who was driving, lost control of the vehicle at a high rate of speed and spun into a utility pole, killing Hughes. Carter had met Hughes just two months earlier at a bar on Third Street called the Band Box. Hughes, who had been thrown out of her home by her husband, did not have a place to stay, and Carter invited her to stay with him in his apartment in Riverside, Ohio. According to Carter, they soon fell in love.
 {¶ 3} On May 13th, according to Carter's testimony, he and Hughes were at the Band Box for over an hour, and Carter consumed two beers. The couple then left for the nearby home of friends to hide Hughes' car, which was about to be repossessed. The friends were not home, and Carter and Hughes waited at the house for 15 — 30 minutes.
 {¶ 4} Carter and Hughes then went to a nearby diner and had something to eat. The couple then returned to the home of their friends, who still were not at home. Carter and Hughes then proceeded to the muffler shop where their friend was employed, and not finding him there, they returned to his home, picking up a six pack of beer along the way. Again finding no one at the house, Carter and Hughes drank a couple of beers and waited for about 45 minutes. Carter then suggested that they take the car to the home of his brother in Riverside, and Hughes agreed.
 {¶ 5} According to Carter, Hughes was driving, but when they reached a nearby intersection, she abandoned the car and began to walk away, leaving the keys in the ignition and her purse in the car. Carter said Hughes stated that she "was just tired of it all, didn't want the car, was tired of the court hearings, the divorce, the drama." Carter testified that he put Hughes back in the *Page 3 
car in the passenger's seat, and that he began to drive, although his license was suspended. Carter stated that Hughes then "got frantic." According to Carter, Hughes was "flaying her arms and legs, grabbing at her chest." Carter stated that he thought Hughes was having a heart attack, and he sped up, heading down Springfield Street to Mechanical Systems of Dayton because the business had a pay phone in their parking lot.
 {¶ 6} As Carter drove down Springfield Street, a four lane road with two lanes in each direction, he observed a car in the left lane ahead of him that changed lanes to get out of his way. Then he "saw the light in the intersection was green and then I — I saw the club. The Ledo Club's there on the corner. I was going to pull over there. Ellen's reaching for the door. Her arm was out the window and I didn't [know] what she was going to do. I reach over. She kind of reached back at me. She hit my hand on the wheel and the car went out of control," spinning into the pole.
 {¶ 7} At trial, Patty Kegley and Allison Orrender, the occupants of the car Carter passed, testified. Kegley stated that she was driving east on Springfield Street with her sister, Orrender, and Kegley and Orrender's daughters. Upon seeing Carter approaching in her rear view mirror, Kegley "turned over to the right-hand lane to get away from him because he was coming up on me too fast and I was afraid that he was going to hit me." Kegley estimated that Carter was traveling at about 90 — 100 miles per hour. Kegley did not get a look at Carter but knew there was a female passenger in the car because "the arm was hanging out the window and she had some rings on her finger." Kegley also observed a car on Smithville Road, at the intersection with Springfield Street, that was stopped and waiting to turn left onto Springfield Street. Kegley said she thought Carter braked briefly, perhaps for the car on Smithville, but then Carter lost control, skidding into the pole. After the accident, Kegley pulled over and waited for the police to arrive. *Page 4 
 {¶ 8} Kegley observed that Carter "had got out of his car, he stumbled to the ground and he tried to get back up, but there was other people there that was trying to sit him down till the police got there." Kegley recognized one of the people near Carter as Robert Orrender, Allison's father-in-law. Kegley testified that she did not actually approach Hughes' vehicle. Upon observing Carter stumbling, Kegley concluded that he was drunk.
 {¶ 9} Allison Orrender testified as follows: "We were driving down Springfield Street and the car was going about 80, 90 miles an hour and it flew past us. The driver was tipping a beer — a brown beer bottle and he flew by us, lost control right around the railroad tracks, hit a pole right around Springfield and Smithville at the light and wrapped his car around the pole.
 {¶ 10} "He got out and he was staggering, walked around the car, looked at the lady in the car, which had lost her arm in the car. She was still alive at that point, looked at her and said, how does it feel to die, Bitch. And walked back around his side of the car and laid on the ground." Allison testified that Hughes had her head down as her car flew past Kegley's vehicle. After the car hit the pole, upon Kegley pulling over to wait for the police, Allison got out of the car and crossed the street. Allison testified that she was close enough to Carter to hear what he said to Hughes. Allison's testimony was contradicted somewhat by her statement to the police, in which she stated that she did not get close to Carter. Allison also did not include Carter's remark to Hughes in her statement to the police. When asked about the inconsistencies in her statement and testimony, Allison stated that her diabetes caused low blood sugar and memory loss at the time that she gave the police her statement. Allison stated that Carter appeared drunk and was stumbling when he got out of Hughes' car. Allison testified that Carter smelled of alcohol, and that she observed a bottle of beer on the floorboard of the car. *Page 5 
 {¶ 11} Robert Orrender, Allison's father-in-law, who was turning left onto Springfield Street from Smithville Road when the accident occurred, also testified. According to Robert, as he was making his turn, he heard "tires screaming." Carter "lost control and was headed toward me and he was going sideways. Otherwise, cross both lanes, you know, but he eventually moved over into my lane. He came so close to me that I had to get out of the car to see if I — I'd been hit and didn't know it." Robert estimated that Hughes' car was traveling about 80 miles an hour when it skidded sideways past him into the pole.
 {¶ 12} Robert parked his car and ran to Hughes' vehicle and opened the driver's side door.
 {¶ 13} Robert found Carter attempting to unbuckle his seat belt. Robert testified that he reached into the car, unbuckled Carter, and helped him from the vehicle. Robert then looked inside the vehicle at Hughes, who was "bleeding to death." Robert returned to Carter, who asked him how Hughes was. Robert told Carter that Hughes was dead.
 {¶ 14} At trial, five other witnesses testified for the State. Russell Uptegrove, a forensic pathologist at the Montgomery County Coroner's Office, who performed an autopsy on Hughes, testified regarding her cause of death. According to Uptegrove, Hughes sustained "significant blunt force injury of the * * * head, with there being multiple fractures, * * * of her skull and — and hemorrhage * * * surrounding the brain, due to the trauma to the head.
 {¶ 15} "She'd also sustained multiple rib fractures involving both the right and left ribs, number one through six of the chest, the sternum, or the breastbone was also fractured. And her pelvic region was fractured, and she'd also had undergone a traumatic amputation at the right upper arm."
 {¶ 16} Donna Dahinghaus, a paramedic for the Dayton Fire Department who responded to *Page 6 
the scene of the accident, also testified. After pronouncing Hughes dead, she assessed Carter. According to Dahinghaus, Carter "had slurred speech and a very strong odor of alcohol on his breath. And he had minor injuries. * * * you could tell he was intoxicated. His — with the slurred speech and his movements weren't normal." When asked how she knew that his movements were the result of intoxication as opposed to just being shaken up, Dahinghaus responded, "Twenty-three years of experience picking up intoxicated people."
 {¶ 17} Jeffrey Thomas, a City of Dayton police officer who was dispatched to the scene of the accident and was the first official to arrive, also testified. Thomas stated that he approached the passenger side of the vehicle and observed that Hughes was not responsive, but "there's a gurgle sound coming from her breath as if she's trying to breathe, but is not able to." Thomas then approached Carter, who was seated on the ground. According to Thomas, "While I was speaking to him, there are several indicators when there's alcohol involved, one of them is a slurred speech. While I was talking to him and while he continued to ask me questions, his S's were coming out more like — more like a mumble. His words were not exactly enunciated correctly.
 {¶ 18} "I was very close to him while talking to him because there were several other people around that were talking. I wanted to make sure I was hearing what he was saying. There was a strong odor of alcohol coming from his breath during that time. The more he talked the more I was certain that it was coming from his breath, not from clothing, not from being spilled anywhere. It was definitely coming from him." Thomas observed a six pack of Bud Light bottles in the car, and he noted that some of the bottles were missing from the package, and that one opened bottle was outside of the driver's side door.
 {¶ 19} Jason Hall, another City of Dayton police officer, testified that he responded to Miami *Page 7 
Valley Hospital where he performed an assessment of Carter to determine if Carter was under the influence of alcohol. Hall stated that he has performed hundreds of similar assessments of people under the influence of alcohol. Hall concluded that Carter was intoxicated. According to Hall, Carter "had a strong odor of alcohol about his person. His eyes were glassy and his speech was slurred." Carter told Hall that he had been to a cookout prior to the accident where he consumed four or five beers. Carter repeatedly asked about Hughes. Hall told Carter that Hughes was dead, and Carter stated that he did not believe Hall, and he started to cry. At the end of the interview, Carter told Hall that a brown truck ran him off the road, but he could not describe the truck or how the accident occurred. After Carter was discharged from the hospital, Hall transported him to the Safety Building in Dayton.
 {¶ 20} Finally, Mark Davis, a traffic accident investigator for the City of Dayton police department, testified for the State. He described the process he employed to reconstruct the accident and the photographs that he took of the scene. At the end of his investigation, Davis concluded that Hughes' vehicle, in the course of the accident, rotated 73 degrees down the roadway for 156 feet before hitting the pole, that it was traveling at about 42 miles an hour at impact, and that the pole penetrated 2.2 feet into the vehicle.
 {¶ 21} Carter asserts one assignment of error as follows:
 {¶ 22} "THE JURY'S VERDICT OF AGGRAVATED VEHICULAR HOMICIDE SHOULD BE REVERSED AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 23} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable *Page 8 
inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367.
 {¶ 24} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve."State v. DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 25} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 26} R.C. 2903.06(A)(1)(a) provides that "no person, while operating * * * a motor vehicle, * * * shall cause the death of another" by violating R.C. 4511.19(A), which prohibits operating a vehicle while under the influence of alcohol. "`It is well established that the definition of `cause' in criminal cases is identical to the definition of `proximate cause' in civil cases. * * * The general rule is that a defendant's conduct is the proximate cause of injury or death to another if the *Page 9 
defendant's conduct (1) is a `substantial factor' in bringing about the harm and (2) there is no other rule of law relieving the defendant of liability. * * *
 {¶ 27} "`A defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death, provided such other factors are not the sole proximate cause of death. * * * Indeed, we have specifically stated that the alleged contributory negligence of a victim may not be used as a defense in a subsequent aggravated vehicular homicide prosecution unless it is the sole proximate cause of death." State v. Filchock, 166 Ohio App. 3d 611, 624,852 N.E.2d 759, 2006-Ohio-2242, citing State v. Flanek (Sept. 2, 1993), Cuyahoga App. No. 63308.
 {¶ 28} According to Carter, "the uncontroverted testimony of the Defendant established that the cause of the accident, and ultimately Ms. Hughes' death, was that Ms. Hughes was flailing about in the car, attempting at one point to open the car door, and finally hitting the Defendant's hand on the wheel, causing the Defendant to lose control of his vehicle. This was clearly the proximate cause of the accident."
 {¶ 29} The matter of the proximate cause of Hughes' death was for the jury to decide, and as long as there was sufficient evidence from which a finding against Carter could be made, beyond a reasonable doubt, it will not be disturbed on appeal. Having reviewed the entire record, weighed the evidence, and considered the credibility of the witnesses, we believe that the record adequately portrays such evidence to permit a finding that Hughes' death was the proximate result of Carter's driving under the influence of alcohol. Carter admitted that he had been drinking prior to the accident. Several witnesses noted Carter's staggering gait, slurred speech, glassy eyes, and odor of alcohol on his breath. Beer bottles were found inside the car, and Allison Orrender testified that she observed Carter drinking while driving. Carter was speeding when he lost control of the car. The *Page 10 
only evidence that Hughes purportedly caused her own death came from Carter. The jury, who saw and heard all the witnesses, clearly rejected Carter's testimony that Hughes' striking Carter's hand purportedly caused him to skid into the pole. In other words, Carter's operation of a motor vehicle while under the influence of alcohol appreciably impaired his driving, causing Hughes' death, and the evidence does not weigh heavily against Carter's conviction such that a new trial is warranted. Since Carter's conviction for aggravated vehicular homicide is not against the manifest weight of the evidence, Carter's sole assignment of error is overruled. Judgment affirmed.
 FAIN, J. and WALTERS, J., concur. *Page 1