[Cite as *State v. Emerson*, 2016-Ohio-8509.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case Nos. 2015-CA-24 |
| Plaintiff-Appellant/Cross-Appellee | : | 2016-CA-1 |
| | : | |
| v. | : | Trial Court Case No. 14-CR-287 |
| | : | |
| RAYMOND R. EMERSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee/Cross-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of December, 2016.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty. Reg. No. 0020615, and DEBORAH S. QUIGLEY, Atty. Reg. No. 0055455, Darke County Prosecutor's Office, 504 South Broadway Street, Suite No.3, Greenville, Ohio 45331
     Attorneys for Plaintiff-Appellant/Cross-Appellee

JON PAUL RION, Atty. Reg. No. 0067020, and NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, Rion, Rion & Rion, L.P.A., Inc., 130 West Second Street, Suite 2150, Post Office Box 10126, Dayton, Ohio 45402
     Attorney for Defendant-Appellee/Cross-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} The State of Ohio appeals from the trial court's October 5, 2015 judgment

entry of conviction and sentence, which, following a jury's guilty verdict, convicted and sentenced appellee/cross appellant Raymond Emerson on fourth-degree felony corrupting another with drugs in violation of R.C. 2925.02(A)(3).

{¶ 2} In two related assignments of error, the State contends the trial court erred in "amending" the charge against Emerson from a second-degree felony, as charged in the indictment, to a fourth-degree felony based on a purported lack of proof that fentanyl was a "Schedule II" controlled substance.

{¶ 3} In a cross appeal, Emerson advances three assignments of error. First, he challenges the legal sufficiency and manifest weight of the evidence to sustain his conviction.[1] Second, he contends the trial court erred in denying his Crim.R. 33 motion for a new trial based on (1) a key prosecution witness presenting "surprise testimony" and (2) the insufficiency of the State's evidence. Third, he asserts that the trial court erred in failing to suppress statements he made to police based on (1) a *Miranda* violation and (2) the statements being involuntary.

{¶ 4}  The record reflects that Emerson originally was charged with involuntary manslaughter, a first-degree felony, and corrupting another with drugs, a second-degree felony. The charges stemmed from his alleged role in the death of his wife, Angela Emerson, on January 18, 2014. Prior to trial, the State dismissed the involuntary manslaughter charge. (Trial Tr. at 5-6). At trial, the State presented evidence that Angela was addicted to prescription drugs and had also abused non-prescription drugs.[2] With

---

[1] Although Emerson's stated first assignment of error mentions only sufficiency, his argument thereunder also addresses the manifest weight of the evidence.

[2] For purposes of clarity, we will refer to Angela Emerson by her first name.

regard to the incident at issue, the State presented testimony that Emerson, a nurse, had admitted to cutting a 50-microgram per hour fentanyl patch and placing half of it on Angela's abdomen to relieve her extreme pain. He then went into his bedroom and went to bed, leaving her alone in the living room. When Emerson later awoke, he found Angela dead on the couch. (*Id.* at 297-298).

{¶ 5} The State introduced evidence that Emerson called in the event as a "probable drug overdose." Angela did not have a prescription for the fentanyl. (*Id.* at 296). She had "scored" (Emerson's word) the patch from a drug dealer the previous day. (*Id.* at 209). Emerson said she had overdosed previously and had a drug addiction problem. (*Id.* at 297-298). Fentanyl packaging comes with a strong warning not to alter the patch, which could defeat the gradual absorption through the permeable membrane and into the skin. (*Id.* at 252). On December 18, 2013, approximately one month before her death, Angela was admitted to Wayne Hospital for a fentanyl overdose where it was reported she had chewed or eaten a fentanyl patch. (*Id.* at 267-268).

{¶ 6} In addition to the State's evidence, in the defense case evidence was introduced that Angela went to the hospital on October 12, 2012 for an overdose, where she was signed in by her husband, after she chewed on her husband's fentanyl patch. On October 17, 2013 she was admitted for an apparent heroin overdose after her husband found her non-responsive and he started "ALS" (advanced life support). On December 18, 2013 she was taken to the hospital for multi-substance abuse, including chewing on a fentanyl patch, after her husband found her lethargic.

{¶ 7} An autopsy revealed the presence of multiple drugs in Angela's system. They included fentanyl, anti-depressants, benzodiazepines, an anti-psychotic, and a muscle

relaxer. (*Id.* at 233). Angela had prescriptions for some but not all of these medications. Her cause of death was determined to be "multiple drug intoxication." (*Id.* at 230).

{¶ 8} Forensic pathologist Susan Allen, who performed the autopsy, testified that she could not say whether fentanyl, as opposed to one of the other drugs, caused Angela's death. (*Id.* at 237). Allen stated that 50 micrograms per hour of fentanyl might be too much for a person to tolerate if the person had "never taken anything like that." (*Id.* at 242). Allen opined that Angela had a "high" level of fentanyl and two other drugs in her system. (*Id.* at 239). Allen also stated that fentanyl could be a "killer drug" if misused. (*Id.* at 242). She then testified that, in her opinion, fentanyl had "played a role" in Angela's death. (*Id.*). But when then asked whether Angela would have died from just the other drugs in her system, Allen responded that she did not know. (*Id.*). Allen also opined that there was "no way to know" when any of the drugs in Angela's system had been taken. (*Id.* at 242-243).

{¶ 9} Darke County Coroner Timothy Kathman also testified for the State. He agreed that Angela's cause of death was "multiple drug toxicity." (*Id.* at 256). He stated that the multiple drug intoxication "could have occurred minutes to hours" before Angela's death. (*Id.* at 270). Kathman acknowledged that in such a case, he could not determine "which drugs or combination of drugs caused the death[.]" (*Id.* at 265). Kathman testified that the fentanyl in Angela's system was "was not at an excessive level." (*Id.* at 269). When asked whether the fentanyl found in Angela's system was at a "therapeutic level," Kathman reiterated that "[i]t was not an excessive level." (*Id.* at 270). Kathman later testified unequivocally that the fentanyl found in Angela's system was not "a deadly dose." (*Id.* at 276). When asked whether she would have died absent the fentanyl, he responded:

"Well, that's an excellent question, but I have no way of determining that." (*Id.* at 276).

{¶ 10} In its closing argument, the State maintained that Emerson was guilty of violating R.C. 2925.02(A)(3), which provides that no person shall knowingly "administer or furnish to another * * * a controlled substance, and thereby cause serious physical harm to the other person[.]" The State argued that Emerson knowingly had administered or furnished the fentanyl patch to his wife. With regard to causing serious physical harm, the State asserted that the fentanyl in combination with the other drugs in Angela's system had stopped her breathing. (Trial Tr. at 393). The State argued that Emerson, who was himself a registered nurse, knew what would happen if Angela took fentanyl with "all her other medications" or "all her other drugs." (*Id.*). For purposes of this case, the trial court instructed the jury that "serious physical harm" was "any physical harm that carries a substantial risk of death." (*Id.* at 403).

{¶ 11} The jury returned a guilty verdict. The verdict form stated that the jury found Emerson guilty "of the offense of Corrupting Another with Drugs." (Doc. #24). The verdict form did not contain the felony level of the offense or state that the drug involved was fentanyl, although that is the only drug contained in the indictment and the only drug that Emerson "administered" to his wife. Following the verdict, the trial court overruled a Crim.R. 29 motion (which Emerson had made during trial and had renewed afterward and which the trial court had held in abeyance) and a Crim.R. 33 motion for a new trial. With regard to the Crim.R. 29 motion, the trial court noted the absence of any "direct testimony" that fentanyl was a "controlled substance" but concluded that such a fact could be inferred from the evidence. The trial court also agreed with Emerson that the State had failed to prove fentanyl was a "Schedule II" controlled substance. It determined, however, that a

conviction under R.C. 2925.02(A)(3), did not require proof of the applicable "schedule" of the drug involved. Citing *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735, the trial court held that Emerson could be convicted and sentenced only for fourth-degree felony corrupting another with drugs because (1) under R.C. 2925.02 the felony offense level depended on the "schedule" of the drug involved and (2) the verdict form did not state the degree of the offense or recite any additional element (i.e., the schedule of the drug fentanyl) elevating the offense from the lowest level, which was a fourth-degree felony. The trial court also refused the State's post-trial request to take judicial notice that fentanyl was a Schedule II controlled substance. Finally, the trial court rejected Emerson's argument that the State had failed to prove causation. It reasoned that the jury could have found causation established based on "multiple drugs combining to cause death." (Doc. #34 at 4). With regard to the Crim.R. 33 motion, the trial court held that a discrepancy between an investigating officer's police report and his trial testimony did not warrant a new trial and that Emerson's conviction was based on sufficient evidence.

{¶ 12} The trial court later sentenced Emerson to community control but also imposed a 60-day jail sentence. In addition, it ordered him to pay a $5,000 fine and imposed other sanctions. This appeal and cross appeal followed.

{¶ 13} In its first assignment of error, the State contends the trial court erred in requiring it to prove that fentanyl was a Schedule II controlled substance and in amending the charge after the verdict to a fourth-degree felony. The State argues that, as a matter of law, fentanyl *is* a "Schedule II" controlled substance under R.C. 3719.41 and that the trial court should have taken judicial notice of that fact. The State insists that it was not required to prove that fentanyl was a "Schedule II" controlled substance. Instead, it

asserts that it was required to prove only that the substance at issue here was fentanyl. The State reasons:

> Corrupting Another with Drugs is a felony of the second degree when the drug involved is included in Schedule I or II. The State proved that Appellee knowingly, by any means, administered or furnished to Angela Emerson Fentanyl and thereby caused serious physical harm to Angela Emerson. The jury returned a verdict of guilty to that charge based upon the facts. It is a matter of law that Fentanyl is a Schedule II controlled substance. R.C. 3719.41. The Court was required to impose the penalty for the violation of R.C. 2925.02(A)(3)(C)(1) as a felony of the second degree. The Trial Court erred when it misinterpreted the law.

(State's Appellate Brief at 5).

{¶ 14} In its second assignment of error, the State asserts that the trial court abused its discretion in requiring the prosecution to prove the additional element that fentanyl was a "Schedule II" controlled substance. In support, the State relies on the same argument supporting its first assignment of error, to wit: that fentanyl *is* a "Schedule II" controlled substance by operation of law and that the trial court should have taken judicial notice of that fact.

{¶ 15} We agree with the State that fentanyl *is* a Schedule II drug under R.C. 3719.41(B)(9), which also means that fentanyl unquestionably is a controlled substance because R.C. 3719.41 establishes "Schedules of controlled substances." Moreover, we disagree with the trial court's application of *Pelfrey* to the verdict in this case for several reasons. First, the defense did not object to the wording of the verdict form at any time.

Second, the post-trial motion for acquittal (Doc. #28) did not raise a *Pelfrey* challenge. Finally, we do not believe *Pelfrey* applies. The *Pelfrey* decision held an offender found guilty of tampering with records could not be found guilty of the greater degree of tampering with *government records* unless the verdict form contained the degree of the offense or the aggravating element that the records were *government records*. The decision was based on R.C. 2945.75(A)(2), which provides: "[w]hen the presence of one or more additional elements makes an offense one of more serious degree: * * * A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged." Here however it is not an additional element that changes the degree of the offense; it is the statutorily classified character of the drug involved. Fentanyl is the drug upon which the charge was based. In this regard, we find this case more like *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, 970 N.E.2d 891, in which the Ohio Supreme Court reinstated a felony conviction for possession of cocaine, rather than a conviction for misdemeanor possession of drugs, when the unchallenged verdict form referred to possession of drugs but the only drug in evidence and in the indictment was cocaine. Nonetheless, we need not resolve whether *Pelfrey* applies because the State cannot appeal the trial court's determination about the degree of the offense.

{¶ 16} Upon review, we conclude that the State's appeal is not permitted by R.C. 2945.67(A). This statute sets forth the circumstances under which the State may appeal in a criminal case. In relevant part, it provides: "A prosecuting attorney * * * may appeal as a matter of right any decision of a trial court in a criminal case * * * which decision

grants a motion to dismiss all or any part of an indictment * * * and may appeal by leave of the court to which the appeal is taken any other decision, except the final verdict, of the trial court in a criminal case[.]"

{¶ 17} The State asserts in its reply brief that it is entitled to appeal as a matter of right because the trial court granted a motion to dismiss part of the indictment (which alleged that fentanyl was a Schedule II controlled substance and charged a second-degree felony) when it convicted and sentenced Emerson for a fourth-degree felony. We disagree. There was no motion to dismiss any part of the indictment. Emerson did file a Crim.R. 29 motion for judgment of acquittal, not raising a *Pelfrey* challenge, which the trial court explicitly *overruled*. (Doc. # 34 at 5). In the course of its ruling, the trial court noted the verdict form's failure to mention that the offense at issue was a second-degree felony or that the drug at issue was a Schedule II controlled substance.[3] The trial court then cited *Pelfrey*, *supra*, and recognized that when a guilty verdict fails to state either (1) the degree of the offense or (2) the presence of an additional element that elevates the degree thereof, the verdict " 'constitutes a finding of guilty of the least degree of the offense charged.' " *Pelfrey*, at ¶ 10, quoting R.C. 2945.75(A)(2). Because the verdict form in this case merely stated that Emerson was guilty "of the offense of Corrupting Another with Drugs," the trial court concluded that it constituted a finding of guilty of the least degree of the offense charged, which was a fourth-degree felony. (Doc. # 34 at 3). Therefore, under *Pelfrey*, the trial court *did not* reduce Emerson's conviction or amend

---

[3] Under R.C. 2925.02(C)(1), the offense of corrupting another with drugs in violation of R.C. 2925.02(A)(3) is a second-degree felony if the drug at issue is a Schedule II controlled substance.

the charge against him; the trial court concluded that the jury simply found him guilty of a fourth-degree felony.[4] Under these circumstances, the State's appeal does not constitute an appeal as a matter of right under R.C. 2945.67(A), and the State did not seek leave to appeal under that statute. Therefore, the State's appeal must be dismissed.

{¶ 18} We turn now to Emerson's appeal. In his first assignment of error, he challenges the legal sufficiency and manifest weight of the evidence to sustain his conviction. Emerson raises the same two issues with regard to the weight and sufficiency of the evidence. First, he contends the State failed to prove that fentanyl is a controlled substance. Second, he claims the State failed to prove that his act of administering or furnishing fentanyl to his wife caused "serious physical harm" as defined by the trial court.

{¶ 19} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v.*

---

[4] Even if the trial court had modified Emerson's conviction, we note that a trial court's post-trial act of altering a jury's verdict by reducing a conviction to a lesser offense is not the functional equivalent of dismissing an indicted charge and does not permit the State to pursue an appeal as of right under R.C. 2945.67(A). *See, e.g., State ex rel. Steffen v. Court of Appeals, First Appellate Dist.*, 126 Ohio St.3d 405, 2010-Ohio-2430, 934 N.E.2d 906, ¶ 34.

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 20} With the foregoing standards in mind, we conclude that Emerson's conviction for corrupting another with drugs is supported by legally sufficient evidence. As set forth above, the statute at issue provides that no person shall knowingly "administer or furnish to another * * * a controlled substance, and thereby cause serious physical harm to the other person[.]" R.C. 2925.02(A)(3). We are unpersuaded by Emerson's claim that the State did not present legally sufficient evidence that fentanyl is a controlled substance. The State presented evidence that Emerson administered or furnished fentanyl to his wife, and the record establishes beyond doubt that fentanyl was the drug at issue. As a matter of law, fentanyl *is* a "controlled substance." R.C. 3719.41. Therefore, by presenting evidence that Emerson administered or furnished fentanyl, the State presented evidence that he administered or furnished a controlled substance. *See, e.g.*, *State v. Rollins*, 3d Dist. Paulding No. 11-05-08, 2006-Ohio-1879, ¶ 30 (reasoning that "while the State is required to name and prove possession of a specific controlled substance, the State is not required to provide evidence that the named substance, in this case methamphetamine, is a controlled substance, because by law, methamphetamine is a controlled substance"). We note too that the trial court instructed the jury, apparently without objection, that fentanyl is a controlled substance. (Court's Exh. 1 at 8).

{¶ 21} A closer question is whether the State presented legally sufficient evidence to prove that Emerson's act of administering or furnishing fentanyl to his wife caused "serious physical harm." Although there are several statutory permutations of what constitutes "serious physical harm," the trial court's only instruction to the jury defined it

as "any physical harm that carries a substantial risk of death."[5] (Trial Tr. at 403). Thus, the issue is whether the State presented legally sufficient evidence to support a finding that Emerson's act of administering or furnishing fentanyl to his wife carried a substantial risk of death.

{¶ 22} We note the trial court instructed the jury, without objection, with the part of OJI 417.25 which states: "[t]here may be one or more causes of an event. However, if a defendant's act or failure to act was one cause, then the existence of other causes is not a defense." We have previously found no error with this instruction. *State v. Fair,* 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 70. When asked "[d]id fentanyl cause Miss Emerson to die?" Dr. Allen responded "It played a role in her death." (Trial Tr. at 242). This testimony alone is sufficient for the case to be submitted to the jury. But in addition, there is the evidence that Angela did not have a prescription for fentanyl, she had prescriptions for multiple drugs she was taking, she had a history of fentanyl abuse, she had a prior fentanyl overdose requiring hospitalization, and Emerson had knowledge of these facts.

{¶ 23} We recognize that the evidence as to the cause of death does not point to a singular explanation. The testimony addressing the causation issue came from forensic pathologist Susan Allen and Darke County Coroner Timothy Kathman. Neither expert presented any testimony to support a finding as to what drugs Angela may have taken or when she took them. To the contrary, Allen acknowledged that there was "no way to know" when any of the drugs in Angela's system had been taken. (Trial Tr. at 242-243).

---

[5] In light of this single definition provided by the trial court, we need not consider whether any alternative statutory definitions might apply.

But given her history of overdose, we need not resolve whether Emerson's singular act was the only cause of any lethal combination of drugs in her system. The record reflects that after placing the fentanyl patch on Angela's abdomen, Emerson went to bed. Whether she previously or subsequently took the other additional drugs of her own volition, then she herself contributed to the multiple drug intoxication that resulted in her death. Likewise, neither expert testified that the fentanyl alone created a substantial risk of death. Allen did opine that Angela had a non-specified "high" level of fentanyl and other drugs in her body. She also opined that fentanyl had "played a role" in Angela's death. (Trial Tr. at 239, 242). This opinion was based on Angela having a multi-drug cocktail in her system that included fentanyl. Allen also did not testify that the fentanyl by itself carried with it a substantial risk of death in this case. The closest she came was saying that a 50 microgram per hour dose of fentanyl could be "too much" for a user who had no tolerance for the drug and who never had "taken anything like that." (*Id.* at 242). However, Allen was not testifying specifically about Angela, who previously had used fentanyl on multiple occasions. Coroner Kathman, the State's other expert, provided testimony that fentanyl alone did not cause the death. He definitively opined that the fentanyl detected in Angela's system after her death was "was not at an excessive level" and that the fentanyl was not "a deadly dose." (*Id.* at 269-270, 276).

{¶ 24} We reiterate, though, that an offender's criminal act does not have to be the sole cause of harm. In *State v. Carter,* 2d Dist. Montgomery No. 21820, 2007-Ohio-5570, Carter was an intoxicated driver who lost control at high speed and struck a pole killing his passenger. Carter argued that the cause of the accident was that the passenger was flailing about, attempting to get out of the car, and had struck Carter's hand on the steering

wheel. In our analysis we stated:

" 'It is well established that the definition of 'cause' in criminal cases is identical to the definition of 'proximate cause' in civil cases. * * * The general rule is that a defendant's conduct is the proximate cause of injury or death to another if the defendant's conduct (1) is a 'substantial factor' in bringing about the harm and (2) there is no other rule of law relieving the defendant of liability. * * *

" 'A defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death, provided such other factors are not the sole proximate cause of death. * * * Indeed, we have specifically stated that the alleged contributory negligence of a victim may not be used as a defense in a subsequent aggravated vehicular homicide prosecution unless it is the sole proximate cause of death." *State v. Filchock,* 166 Ohio App.3d 611, 624, 852 N.E.2d 759, 2006-Ohio-2242 [(11th Dist.)], citing *State v. Flanek* (Sept. 2, 1993), Cuyahoga App. No. 63308 [1993 WL 335601].

*Id.,* ¶¶ 26-27.

**{¶ 25}** Construing the evidence in the light most favorable to the prosecution, we determine that the evidence was sufficient such that a reasonable juror could conclude that administration of the fentanyl to Angela, a person known to take other drugs with a history of abuse and overdose, created a substantial risk of death and was a contributing cause of Angela's death.

{¶ 26} Our analysis of whether the evidence is against the manifest weight of the evidence is based on a different standard and different, or rather additional, evidence. In determining whether a conviction is against the manifest weight of the evidence, we must review the entire record, weighing all the evidence presented and decide whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 27} The entire record includes the additional medical record information revealing that Angela had been hospitalized for overdoses three times within 15 months of her death, the last of which was just one month before her demise. Two of the overdoses involved fentanyl. Her husband had found her unresponsive or lethargic. Under these circumstances we cannot say that the jury lost its way by finding Emerson guilty of the charge of corrupting another with drugs. Because we found the evidence to be sufficient and not against the manifest weight, Emerson's first assignment of error is overruled.

{¶ 28} In his second assignment of error, Emerson contends the trial court erred in overruling his new-trial motion. He argues that a new trial was required because the State's "star" witness presented "surprise testimony" at trial.[6]

{¶ 29} Emerson's argument concerns the testimony of Arcanum police officer

---

[6] Emerson also asserts that a new trial was required based on the same evidentiary arguments raised in his first assignment of error. We need not repeat our analysis of that assignment of error.

David Kiser. At trial, Kiser testified that he interviewed Emerson as part of his investigation into Angela's death. According to Kiser, Emerson told him Angela had purchased a 50-microgram per hour fentanyl patch from a drug dealer and that Emerson admitted cutting the patch and placing it on Angela's abdomen. (Trial Tr. at 296-297, 324-325). On cross examination, Kiser acknowledged that a typed police report he completed after the interview stated that Angela had purchased a 25-microgram fentanyl patch, not a 50-microgram patch. (*Id.* at 325-326). Kiser denied defense counsel's suggestion that he had written a "false report" and explained that his typed reference to a 25-microgram fentanyl patch being involved was an "error" and that his earlier handwritten notes correctly had referenced a 50-microgram patch. (*Id.* at 325-326).

{¶ 30} On appeal, Emerson argues that Kiser's trial testimony about a 50-microgram fentanyl patch being involved constituted "surprise testimony" that deprived him of a fair trial. This argument lacks merit. Kiser's handwritten notes referenced a 50-microgram patch being involved. His subsequent typed report mistakenly referenced a 25-microgram patch (possibly because a 25-microgram fentanyl patch wrapper had been found in the house). The handwritten notes and the typed report both were provided to Emerson during discovery. At trial, Kiser explained the discrepancy, and defense counsel cross examined him about it. We see no basis for ordering a new trial under Crim.R. 33. The trial court's refusal to grant a new trial based on Kiser's mistake about a 25-microgram or 50-microgram fentanyl patch being involved did not constitute an abuse of discretion. The second assignment of error is overruled.

{¶ 31} In his third assignment of error, Emerson challenges the trial court's refusal to suppress his statements to Kiser about administering the fentanyl patch to Angela.

Specifically, Emerson contends the trial court erred in finding (1) that *Miranda* warnings were not required because he was not in custody and (2) that his statements to Kiser were voluntary.

**{¶ 32}** With regard to the *Miranda* issue, the trial court noted the parties' disagreement about whether Emerson had been advised of his rights. The trial court found no need to resolve that issue, however, because it determined that Emerson was not in custody when Kiser interviewed him. It is well settled that *Miranda* applies only to "custodial interrogation." *State v. Mobley*, 2d Dist. Montgomery No. 26044, 2014-Ohio-4410, ¶ 20. To determine whether a defendant was in custody when police questioning occurred, the relevant inquiry is how a reasonable person in the defendant's position would have understood the situation. *State v. Lewis*, 2d Dist. Montgomery No. 18098, 2000 WL 1867568, *3 (Dec. 22, 2000). More specifically, the question is whether a reasonable person would have felt that he was under arrest or that his freedom of movement was restrained to an extent associated with a formal arrest. *State v. Knight*, 2d Dist. Montgomery No. 24130, 2011-Ohio-3284, ¶ 14.

**{¶ 33}** Here we agree with the trial court that Kiser's interrogation of Emerson was not "custodial." At Kiser's request, Emerson drove himself to the Arcanum City Building a few days after Angela's death. The building housed the police department and other municipal departments. Emerson and Kiser met in a common council room that was not part of the police department's offices. (Suppression Tr. at 11-12). The two men met alone, and the door was not locked. (*Id.* at 13). At that time, police were "looking at everybody," but Emerson was not a "primary suspect." (*Id.*). Kiser mostly wanted to find out "what happened with Angela." (*Id.*). According to Kiser, he agreed not to record the

conversation at Emerson's request. (*Id.* at 14). Kiser testified that the interview lasted an hour or a little more. (*Id.* at 15). Kiser also testified that he offered Emerson water and a break. (*Id.* at 18). After the interview, the two men shook hands, and Emerson left. (*Id.* at 17).

{¶ 34} Emerson also testified at the suppression hearing, and his testimony differed from Kiser's in some respects. According to Emerson, the interview lasted five to six hours. (*Id.* at 47, 49). He denied Kiser offering him water or a break. (*Id.* at 48). Emerson stated that he felt compelled to be there and not free to leave. (*Id.* at 49). He additionally asserted that he requested a lawyer during the interview—a claim Kiser disputed. (*Id.* at 16-17, 49). Emerson also denied requesting that the interview not be recorded. (*Id.* at 50). He acknowledged that he drove home after the interview. (*Id.* at 53).

{¶ 35} The trial court's suppression ruling does not resolve most of the foregoing factual disputes. But even if we assume, arguendo, that the interview lasted five hours, that Kiser did not offer water or a break, that Emerson requested counsel (a claim the trial court did reject), and that Emerson did not object to the interview being recorded, we see no reasonable, objective grounds for Kiser's subjective belief that he was not free to leave any time he wished. Emerson arrived voluntarily for the one-on-one meeting with Kiser in an unlocked conference room at the Arcanum City Building and freely left when the meeting ended. The record contains no evidence of threats during the meeting. Nor was Emerson's freedom of movement restricted. He was not told that he could not leave. There is no evidence that Kiser intimidated Emerson or dominated the meeting. *See Knight* at ¶ 15-25. Accordingly, we conclude that Emerson was not in custody during the interview and that *Miranda* warnings were not required.

**{¶ 36}** The only remaining issue is whether Emerson's statements to Kiser were involuntary. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164.

**{¶ 37}** In support of his argument that his statements were coerced, Emerson points to his testimony that the interview lasted hours without a break. He also cites his "medical issues." His primary argument, however, is that Kiser discouraged him from obtaining counsel and continued questioning him after he requested counsel.

**{¶ 38}** Upon review, we see no coercive police activity. Given our determination above that Emerson was not in custody, he could have stopped talking if he thought the interview was too long or wanted a break. With regard to medical issues, the record reflects that he arrived for the interview on crutches and was taking various medications. (Suppression Tr. at 46, 51). We fail to see, however, how these facts establish any police coercion. With regard to Emerson's request for counsel, we make two observations. First, the trial court found his testimony about requesting counsel not credible. (Doc. # 17 at 4). Second, even if Emerson did request counsel, Kiser was not obligated to honor the request or cease questioning given that Emerson was not in custody. If Emerson did not want to talk without counsel, he simply could have left. *See*, *e.g., State v. Brantley*, 9th Dist. Wayne No. 27466, 2016-Ohio-4680, ¶ 52 (recognizing that a police officer may continue questioning after a request for counsel in a non-custodial situation and that doing

so does not necessarily render a suspect's statements involuntary). Emerson's third assignment of error is overruled.

{¶ 39} For the reasons set forth above, we hereby dismiss the State's appeal as not authorized by R.C. 2945.67(A). With regard to Emerson's cross-appeal, we affirm his conviction for fourth-degree felony corrupting another with drugs.

{¶ 40} Accordingly, the State's appeal is dismissed; and with regard to Emerson's cross-appeal, the trial court's judgment is affirmed.

. . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

R. Kelly Ormsby, III
Deborah S. Quigley
Jon Paul Rion
Nicole Rutter-Hirth
Jonathan P. Hein