[Cite as *State v. Seymour*, 2024-Ohio-5179.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

     Plaintiff-Appellee,            :                    No. 22AP-721
                                                                    (C.P.C. No. 19CR-4039)
v.                                      :
                                                            (REGULAR CALENDAR)
Carol A. Seymour,                       :

     Defendant-Appellant.           :

---

D E C I S I O N

Rendered on October 29, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.
**Argued**: *Seth L. Gilbert*.

**On brief:** [*Mitchell A. Williams*], Public Defender, and *George M. Schumann*, for appellant.
**Argued**: *George M. Schumann*.

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Defendant-appellant, Carol A. Seymour, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a bench trial, that found her guilty of involuntary manslaughter, corrupting another with drugs, and trafficking in heroin. For the reasons that follow, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On August 16, 2019, Seymour was indicted by a Franklin County Grand Jury on one count of involuntary manslaughter in violation of R.C. 2903.04, a felony of the first degree (Count One); one count of corrupting another with drugs in violation of R.C. 2925.02, a felony of the second degree (Count Two); and one count of trafficking in heroin in violation of R.C. 2925.03, a felony of the fifth degree (Count Three). The indictment

arose from Seymour's role in the overdose death of the decedent, Robby J. Alsey, on January 10, 2019. Seymour pleaded not guilty, and the matter proceeded to a bench trial at which the following evidence was adduced.

{¶ 3} Lisa Baker is the mother of the decedent in this case. (Sept. 6, 2022 Tr. Vol. I at 52-53, 55.) Baker testified that, at the time of his death, Alsey lived at her home in Grove City. (Tr. at 52-53, 55.) According to Baker, Alsey had suffered from addiction to heroin since he took OxyContin for a hernia surgery 20 years ago. (Tr. at 61-62.) Over the years, Alsey participated in rehabilitation and counseling and, in August 2018, he began taking Suboxone to manage his addiction and withdrawal symptoms. (Tr. at 64, 83.) Alsey ultimately stopped attending counseling sessions, which caused him to lose access to Suboxone. (Tr. at 64, 83.) At the time of his death, Alsey was also taking the over-the-counter medications, Benadryl and mitragynine ("kratom"). (Tr. at 97-100.) According to Baker, kratom is used by addicts to help alleviate the symptoms of heroin withdrawal. (Tr. at 85-86.)

{¶ 4} In the early afternoon of January 10, 2019, Alsey asked Baker if he could give Seymour some antifreeze for her vehicle, which she agreed. (Tr. at 56.) According to Baker, Seymour picked Alsey up in her vehicle and dropped him off later that afternoon. (Tr. at 56-57.) An hour or so after Alsey returned home, Baker discovered him on the floor near his bed. Upon noticing that Alsey was cold and without a pulse, she called 911. (Tr. at 58-59.)

{¶ 5} Detective Nicholas Deskins, a Grove City police officer specializing in narcotics, testified that when he arrived at the scene, he observed heroin and drug paraphernalia in Alsey's proximity. (Tr. at 158-59, 162.) According to Deskins, Baker informed him that Alsey had put antifreeze in Seymour's vehicle, and they left the house for approximately 45 minutes to one hour. (Tr. at 173.) Police analyzed cellphone data to track the location and activity of Seymour and Alsey during that afternoon. (Tr. at 176-77). The records reflect that, after picking up Alsey, Seymour made multiple calls to a phone number later discovered to belong to an individual known as Sundown, a person the police identified as a drug dealer. (Tr. at 183-85.) Deskins stated that the cellphone data analysis revealed Seymour and Alsey traveled to a home, which the police had previously observed Sundown sell drugs to other buyers. (Tr. at 185-86, 190-93.) The cellphone records also tracked them returning to Alsey's home. (Tr. at 191-92). Deskins testified to messages from

Alsey to Baker asking for prescription medications. (Sept. 7, 2022 Tr. Vol. II at 227-29, 231.) According to Deskins, Baker admitted that she provided Alsey with Gabapentin, a prescription drug, to help him sleep. (Tr. at 227-29, 231.) Deskins also recounted multiple text messages where Alsey requested Baker provide him the Attention-Deficit Hyperactivity Disorder ("ADHD") medication, Focalin. (Tr. at 231-32.)

{¶ 6} Deskins described an interview he conducted with Seymour on the porch of her home. (Tr. Vol. I at 195.) According to Deskins, Seymour admitted she took Alsey to Sundown, and Alsey was there to buy "that shit." (Tr. at 196.) According to Seymour, when they arrived, an individual named Marlin Johnson, Jr. came outside and handed Seymour a packet of heroin, who then passed it to Alsey. (Tr. at 197). Alsey paid Johnson the money, and they left. (Tr. at 197).

{¶ 7} Deskins further described how Seymour admitted to acting as a "go-between" facilitating drug deals by transporting buyers to sellers and taking a small fee or a cut of the drugs as payment for her services. (Tr. at 197-98.) "[P]art of the drugs as payment [was] to support her habit." (Tr. at 198.) On the particular day of Alsey's drug buy, Seymour claimed Alsey bought $15 worth of "boy," the street name for heroin, and because Alsey viewed this as a small amount, he was unwilling to give her any heroin. (Tr. Vol. I at 198, Tr. Vol. II at 220.) As payment, Seymour received antifreeze in exchange for taking Alsey to purchase heroin. (Tr. at 198.) Seymour claimed she warned Alsey not to do all the drugs or inject the drugs because she worried the heroin was particularly strong. (Tr. at 199.) Deskins testified that at the scene, they discovered the following: a syringe; a plate with a spoon and a straw; aluminum foil rolled up, presumably to serve as a pipe; a small plastic bag that a subsequent lab analysis identified as containing heroin residue; a pill bottle with the label ripped off that contained a combination of crushed and whole tablets of a drug initially identified as Gabapentin; and a disassembled pink and white pill capsule that had contained Focalin. (Tr. Vol. I at 153, 162, 165-71, Tr. Vol. II at 255-58.)

{¶ 8} On cross-examination, Deskins admitted it was possible the pill bottle contained Ritalin instead of Gabapentin, though he went on to explain his belief that the tablets were Gabapentin based on their markings and the fact that Baker had a prescription for Gabapentin. (Tr. at 248-50.) Baker showed the officers her own Gabapentin, and Deskins confirmed her tablets resembled those in the pill bottle found near Alsey's body. (Tr. at 297.)

{¶ 9}   Dr. Kevin Jenkins, then a forensic pathologist for the Franklin County Coroner's Office, performed the autopsy on Alsey.  (Tr. at 320-21.)  In his testimony, Dr. Jenkins identified the cause of death as acute heroin, kratom, methylphenidate ("Ritalin"), and diphenhydramine ("Benadryl") intoxication.  (Tr. at 326.)  Dr. Jenkins noted that kratom and Benadryl are both available over the counter.  (Tr. at 327-28.)  When asked whether he could "single out one drug that was more responsible than the others" in causing Alsey's death, Dr. Jenkins replied, "[n]o, I cannot." (Tr. at 327.) Dr. Jenkins also testified that none of the four drugs could be singled out as a primary cause of death.  (Tr. at 335.)  Rather, he agreed with the statement that all four drugs "worked together to cause the death" and testified the drugs are "synergistic" and make "the effect of them stronger." (Tr. at 326-27, 354.)   He also agreed with the statements that each of the drugs "contributed" to Alsey's death. (Tr. at 336.) Furthermore, when asked whether Alsey would still have died if any one of the four drugs was removed from the mixture, Dr. Jenkins declined to make such a claim.  (Tr. at 336.)   In his experience with overdose cases, Dr. Jenkins testified it was "[e]xtremely rare" for Benadryl and "very rare" for Ritalin to be the primary cause of death.  (Tr. at 336-37.)  Dr. Jenkins did note that Alsey's levels of Ritalin were "elevated."  (Tr. Vol. II. at 341-42, Sept. 8, 2022 Tr. Vol. III at 383-86.) Dr. Jenkins agreed that kratom blood concentrations listed in fatal cases range from 20 to 600 nanograms per millimeter; Alsey's level of kratom was measured at 570 nanograms per millimeter.  (Tr. Vol. II. at 345-46.)  Dr. Jenkins characterized these levels as on the high end of the spectrum found in other fatal cases.  (Tr. at 346.)  He noted such cases involving kratom are "becoming more common." (Tr. at 337.)

{¶ 10}  Dr. Jenkins testified that kratom "combined with other things could have led to [Alsey's] death."  (Tr. at 353.)  Dr. Jenkins noted, however, that among the four drugs present in this case, heroin is the most common primary cause of death in overdose cases. (Tr. at 336-37, 353.)  Dr. Jenkins also stated that while caffeine, nicotine, cotinine, and Gabapentin were identified in Alsey's system, they were not listed as causes of Alsey's death. (Tr. at 340.) Dr. Jenkins acknowledged that he could not say that "the heroin alone" caused Alsey's overdose or even serious physical harm.  (Tr. at 347.)

{¶ 11} As the Chief Toxicologist at the Franklin County Coroner's Office, Daniel Baker oversaw and certified the systematic toxicological analysis performed on Alsey. Baker "very conservatively" estimated that Alsey took the heroin within five hours of his

death. (Tr. Vol. III at 374.) He next testified the level of morphine, a metabolite of heroin, in Alsey's blood was "typical" of a heroin-related death. (Tr. at 376.) Baker acknowledged, though that he could not say that heroin alone caused Alsey's overdose. (Tr. at 401.)

{¶ 12} On October 5, 2022, the trial court denied Seymour's Crim.R. 29 motion for acquittal and found her guilty on all three counts. On November 7, 2022, the trial court held a sentencing hearing in this matter. For the purposes of sentencing, the trial court merged the counts of involuntary manslaughter and corrupting another with drugs and imposed a sentence of four years in prison. The trial court also sentenced Seymour to ten months in prison for trafficking in heroin that ran concurrent with the four-year term of incarceration.

{¶ 13} Appellant timely appealed.

## II. ASSIGNMENTS OF ERROR

{¶ 14} Appellant assigns the following as trial court error:

> [I.] The finding of guilt as to count one, involuntary manslaughter, is not supported by the sufficiency of the evidence, because there is insufficient evidence of actual causation as required for the offense.

> [II.] The finding of guilt as to count two, corrupting another with drugs, is not supported by the sufficiency of the evidence, because there is insufficient evidence of actual causation as required for the offense.

## III. LEGAL ANALYSIS

### A. Seymour's First and Second Assignments of Error

{¶ 15} In Seymour's first and second assignments of error, she contends there was insufficient evidence of actual causation to support her convictions of involuntary manslaughter or corrupting another with drugs. Seymour does not challenge her conviction for trafficking in heroin. Because the assignments of error are interrelated, we will address them together.

### 1. Standard of Review

{¶ 16} Whether the evidence is sufficient to support a conviction as a matter of law involves a determination as to whether the state met its burden of production at trial. *State v. R.J.C.*, 10th Dist. No. 21AP-651, 2024-Ohio-1670, ¶ 24, citing *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16. " 'Sufficiency of the evidence is a legal standard that

tests whether the evidence introduced at trial is legally sufficient to support a verdict.' " *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 45, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). As part of our sufficiency of the evidence analysis, we do not weigh the evidence but instead resolve " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When examining the sufficiency of the evidence, a reviewing court "assess[es] not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Edmonds*, 8th Dist. No. 104528, 2017-Ohio-745, ¶ 33, citing *Thompkins*.

{¶ 17} To demonstrate corrupting another with drugs, R.C. 2925.02(A)(3) requires a showing that the defendant "knowingly * * * [b]y any means, administer, or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person." Conversely, to meet the elements of involuntary manslaughter, the state must show, beyond a reasonable doubt, that the defendant "cause[d] the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). By " 'referencing the proximate result of death cause[d] by the defendant's actions, [R.C. 2903.04(A)] is talking about proximate cause.' " *State v. Crawford*, 169 Ohio St.3d 25, 2022-Ohio-1509, ¶ 15, quoting *State v. Carpenter*, 3d Dist. No. 13-18-16, 2019-Ohio-58, ¶ 51.

### 2. Causation

{¶ 18} The concept of proximate cause consists of two separate but related assertions. *State v. Yerkey*, 171 Ohio St.3d 367, 2022-Ohio-4298, ¶ 44 (J. Dewine, dissenting.) The first is actual cause, or cause-in-fact, which traditionally means that the former event caused the latter. *Id.*, citing *Paroline v. United States*, 572 U.S. 434, 444 (2014). Conversely, legal cause generally requires a showing of reasonable foreseeability. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981).

{¶ 19} In both assignments of error, Seymour's sole argument is that there was insufficient evidence presented at trial to demonstrate actual causation in the involuntary

manslaughter and corrupting another with drugs convictions. Accordingly, we will limit our analysis to that element.

### 3. Actual Causation

{¶ 20} When analyzing actual causation, Ohio courts have consistently applied the "but-for" test. The "but-for test" is defined as "the doctrine that causation exists only when the result would not have occurred without the party's conduct." *Black's Law Dictionary* 241 (10th Ed.2014). The Supreme Court of Ohio has recognized the "but-for" test of causation as the "standard test for establishing cause in fact." *Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 2008-Ohio-5243, ¶ 48, citing *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84-85 (1996); *see also Carpenter* at ¶ 52; *State v. Evans*, 8th Dist. No. 111964, 2023-Ohio-2688, ¶ 54, citing *State v. Womack*, 7th Dist. No. 19 MA 0068, 2020-Ohio-5018, ¶ 20.

This court has previously applied the "but-for" test when examining whether there was sufficient evidence to demonstrate actual causation in involuntary manslaughter cases. *See, e.g., State v. Brisco*, 10th Dist. No. 16AP-759, 2017-Ohio-8089, ¶ 25 (finding defendant caused the victim's death as a result of having a weapon under disability as "[b]ut for [the defendant] having a gun, the death would not have occurred"); *State v. McDonald*, 10th Dist. No. 00AP-1120, 2001 Ohio App. LEXIS 2067, *6 (May 10, 2001), quoting *State v. Lovelace*, 137 Ohio App.3d 206, 216 (1st Dist.1999) (finding that for a defendant's conduct to be the proximate cause of a particular result, it must first be determined that the conduct was the cause-in-fact of the result, " 'meaning that the result would not have occurred "but for" the conduct' "). Other Ohio courts also applied "but-for" causation analysis when reviewing the sufficiency of the evidence of an involuntary manslaughter conviction. *See, e.g., State v. Potee*, 12th Dist. No. CA2016-06-045, 2017-Ohio-2926, ¶ 34 (finding there was sufficient evidence to support the involuntary manslaughter conviction as the decedent would not have died "but for" the sale of the heroin and fentanyl); *State v. Mitchell*, 3d Dist. No. 14-19-14, 2019-Ohio-5168, ¶ 30 (concluding there was sufficient evidence to establish the cause-in-fact element of the involuntary manslaughter conviction as "but-for" the defendant trafficking in drugs, the death would not have occurred); *State v. Lazzerini*, 5th Dist. No. 2019CA00142, 2021-Ohio-1998, ¶ 89; *Kosto*, 5th Dist. No. 17 CA 54, 2018-Ohio-1925, ¶ 24-25.

### 4. *Burrage* and *Kosto*

{¶ 21} Seymour argues that we should adopt the "but-for" causation rationale in *Burrage v. United States*, 571 U.S. 204, 212 (2014), which was then applied in *State v. Kosto*, 2018-Ohio-1925, ¶ 24-25. The state argues the "substantial" factor test is more appropriate as this case concerns multiple causes combined to inflict a single legal injury on the victim's death. The state distinguishes the above cases finding that *Burrage* concerns a federal sentencing statute and *Kosto* fails to examine Ohio law. Because *Burrage* and *Kosto* have become so intertwined in this discussion, a brief review of these cases is instructive.

{¶ 22} In *Burrage*, the decedent died after an extended drug binge that included the use of heroin provided by the defendant. *Id*. at 206. The decedent's blood contained multiple drugs at the time of death including: heroin metabolites, codeine, alprazolam, clonazepam metabolites, and oxycodone. *Id*. at 207. The government charged Burrage with two counts of distributing heroin in violation of 21 U.S.C. 841(a)(1). *Id*. In the second count of the indictment, the government alleged Burrage unlawfully distributed heroin and that the victim's " 'death * * * resulted from the use of th[at] substance,' " which subjected him to the 20-year mandatory minimum sentence under 21 U.S.C. 841(b)(1)(C). *Id*., quoting the indictment. At trial, the expert witnesses testified that the victim's use of heroin contributed to his death, but they could not say that the victim would have lived if he had not taken the heroin. *Id*. The defendant was convicted on both counts, and the trial court sentenced him to the mandatory 20 years in prison under 21 U.S.C. 841(b)(1)(C)'s prescribed minimum. *Id*. at 208. The Eight Circuit Court of Appeals affirmed the conviction. *Id*.

{¶ 23} The United States Supreme Court granted certiorari on two questions: "[w]hether the defendant may be convicted under the 'death results' provision (1) when the use of the controlled substance was a 'contributing cause' of the death, and (2) without separately instructing the jury that it must decide whether the victim's death by drug overdose was a foreseeable result of the defendant's drug-trafficking offense." *Id*. at 208. In an opinion by Justice Antonin Scalia, the Court began its causation analysis by explaining that causation is a hybrid concept that makes up two constituent parts: actual cause and legal cause. *Id*. at 210. The Court noted that addressing those prongs are similar to the two questions that were granted certiorari. *Id*. The Court wrote, "[w]e find it

necessary to decide only the first: whether the use of heroin was the actual cause of [the victim's] death in the sense that §841(b)(1)(C) requires." *Id.*

{¶ 24} In its examination of the statutory language, the *Burrage* court explained the ordinary meaning of "resulted from" requires a showing of actual causality, i.e., but for the defendant's conduct, the death would not have occurred. *Id.* at 212. The government argued that drug overdoses that involve multiple drugs should apply "an interpretation of 'results from' under which use of a drug distributed by the defendant need not be a but-for cause of death, nor even independently sufficient to cause death, so long as it contributes to an aggregate force (such as mixed-drug intoxication) that is itself a but-for cause of death." *Id.* at 214.

{¶ 25} The Court first explained that "but-for" causation was distinct from cases such as "when multiple sufficient causes independently, but concurrently, produce a result." *Id.* at 214-15. The Court provided by way of example a situation where A fatally stabs B at the same time when X, acting independently, fatally shoots B. *Id.* at 215. The *Burrage* court wrote, under those circumstances, neither A's nor X's action can be considered the "but-for" cause of B's death as B would have died regardless of the fatal stab wound because he was shot at the same time and vice versa. *Id.* at 215. "A will generally be liable for homicide even though his conduct was not a but-for cause of B's death (since B would have died from X's actions in any event)." *Id.* The Court concluded it did not need to apply the independently sufficient test as there was no evidence that the victim's heroin use was an independently sufficient cause of death. *Id.*

{¶ 26} The Court went on to address the government's central argument that an act or omission is considered a cause-in-fact if it was a "substantial" factor in the given result. *Id.* at 215-16. The Court recited language "functionally identical" to the government's argument that "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." (Citation omitted.) *Id.* at 216. In declining to adopt the government's "substantial factor" test, the Court characterized the approach as "less demanding (but also less well established)" and explained "[t]he language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." *Id.* at 215-16. The *Burrage* court wrote that if

Congress had intended the mandatory minimum sentence to apply when a drug contributed to the victim's death, it could have done so. *Id.* at 215-16. The Court concluded, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U. S. C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 218-19.

{¶ 27} In *Kosto*, the defendant was indicted, among other offenses, on one count of involuntary manslaughter and one count of corrupting another with drugs stemming from a heroin overdose death. *Kosto* at ¶ 6. The evidence indicated that Kosto had been the sole source of heroin to the decedent in the 48 hours prior to his death. *Id.* at ¶ 6. The coroner in the case testified the cause of death was the combined effect of cocaine and heroin. However, the coroner could not say with a reasonable degree of certainty that heroin alone caused the death. "There's no way to tell for sure if he would have died of only heroin. There's no way to tell if he would have died only of cocaine. But, certainly, he died when they were both mixed together." *Id.* at ¶ 21. Kosto was ultimately found guilty on all charges and sentenced to an aggregate term of five years in prison. *Id.* at ¶ 9. On appeal, the Fifth District Court of Appeals reversed the involuntary manslaughter and corrupting another with drugs convictions. The *Kosto* court, relying on the "but-for causality" rationale in *Burrage*, found the evidence was insufficient that the heroin supplied by Kosto was the "but-for" cause of the decedent's death. *Id.* at ¶ 24, 29.

{¶ 28} While we agree with the state's contention that *Burrage* is not controlling and that *Kosto* did not examine Ohio law on causation, that does not end our inquiry. What appears lost in this discussion is that, even outside the holdings in *Burrage* and *Kosto*, Ohio courts have traditionally utilized the "but-for" test to determine actual causation. *See supra* ¶ 21-22. Justice Scalia's examination of the various tests to resolve whether a defendant's actions were the cause-in-fact of death mirrors the same tests at issue in this case. While *Burrage* does not control, the *Burrage* court's analysis of the different tests for examining actual causality in the context of mixed-drug overdose cases is highly probative. Thus, while it does not control our review, the "but-for" causation rationale in *Burrage* serves as a useful complement to established Ohio law.

### 5. "Substantial" Factor Test

{¶ 29} To be sure, some Ohio courts have identified circumstances in which the

"but-for" causation test is inapplicable, and an act or omission can be considered a cause-in-fact of the harm if it was a "substantial" factor in producing the result. *See*, *e.g.*, *State v. Hall*, 12th Dist. No. CA2015-11-022, 2017-Ohio-879, ¶ 71-74. There are two reasons often cited as support for deviating from the prevailing "but-for" analysis. The first is that the "but-for" test is inappropriate when there is a "textual or contextual indication to the contrary." *State v. Williams*, 7th Dist. No. 19 CO 0010, 2020-Ohio-4430, ¶ 34, citing *Paroline* at 458, citing *Burrage* at 212. The Seventh District Court of Appeals indicated the "proximate result" language in R.C. 2903.04(A) was analogous to the statutory language at issue in *Paroline* providing a textual indicator to depart from the "but-for" causation analysis. *Id.*

{¶ 30} In *Paroline*, the victim was sexually abused as a child during the production of pornography and later learned that the images of her abuse were trafficked on the internet. Paroline was found guilty of possessing images of child pornography, which included two images of the victim. The victim, pursuant to 18 U.S.C. 2259, sought restitution of nearly $3 million in lost income and approximately $500,000 in future treatment and counseling costs. The district court declined to award the victim restitution citing the government's failure to demonstrate what losses were the proximate cause of the defendant. The victim filed a writ of mandamus asking the Fifth Circuit Court of Appeals to direct the district court to pay restitution. The Fifth Circuit held that the statute did not limit restitution to the amount caused by the defendant and each defendant who possessed the victim's images was liable for the entire loss from the trade in those images. The United States Supreme Court reversed finding that, under the statute, restitution was proper only for the amount that the defendant's offense caused the victim's losses. The Supreme Court deviated from *Burrage* finding that the restitution statute's "proximate results" language amounted to a textual indicator that the "but-for" was not required. *Paroline* reasoned that the "but-for" test was too strict in this context as it would undermine congressional intent. *Id.*

{¶ 31} We find *Paroline* is inapplicable for several reasons. First, *Paroline* is factually distinct as it concerns the amount of available restitution a victim may obtain under the statute and not the criminal prosecution of defendant. The issue of causation in *Paroline* was particularly unique as it was nearly impossible to quantify the amount of the losses to one defendant. *Paroline* grappled with the difficulty of tailoring a restitution

figure that was neither too "severe" nor one that was "token" or a "nominal amount." *Id.* at 458-59. The Supreme Court explained the peculiar circumstances of the case writing:

> In this special context, where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying §2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id.* at 458.

{¶ 32} While the majority viewed the decision as a "common sense" causation limitation, the dissent noted the conclusion improperly accounted for "policy considerations" to support its departure from relevant causal language. *Id.* at 467, 470 (Roberts, C.J., dissenting). "The statute as written allows no recovery; we ought to say so, and give Congress a chance to fix it." *Id.* at 472 (Roberts, C.J., dissenting). Here, we are solely focused on reviewing the sufficiency of the evidence of a criminal conviction. Unlike the causation inquiry in *Paroline*, we know exactly the scope of the loss and causes at issue as the decedent died from the lethal combination of four drugs in his system.

{¶ 33} From a statutory standpoint, Ohio courts have generally not interpreted the "proximate result" language in the involuntary manslaughter statute as an indicator to support a deviation from the "but-for" causation analysis. This can be explained by the way Ohio law has used various terms for causation interchangeably. As set forth previously, by referencing the "proximate result" of death "caused" by the defendant's actions, the involuntary manslaughter statute is referring to "proximate cause." *Crawford* at ¶ 15, citing *Carpenter* at ¶ 51; *see also State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, ¶ 9 (reasoning that there is symmetry between the phrases "proximate cause" and the felony murder statute's use of "proximate result"). " 'It is merely a matter of semantics that criminal cases are "cause" and "result" and civil cases use "proximate cause" and "proximate result." They mean the same thing. In fact, R.C. 2903.04 (Involuntary Manslaughter) uses "proximate result" to state the offenses.' " *Carpenter* at ¶ 51, quoting *State v. Jacobs*, 8th Dist. No. 51693, 1987 Ohio App.LEXIS 6828, *2 (Apr. 23, 1987). Despite the use of "proximate result" in the involuntary manslaughter statute, the state is still required to demonstrate actual causation, which traditionally requires a "but-for" causation analysis. *See, e.g., Potee* at ¶ 33 (internal citation omitted) ("[g]enerally, for a

criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct.")  Arguendo, even if the "proximate result" language in the involuntary manslaughter statute did provide a textual indictor that "but-for" causation would not apply, the corrupting another with drugs statute, which is also at issue in this appeal, does not include such language.  *See* R.C. 2925.02(A)(3) ("knowingly * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person.")  Given the factual distinctions and Ohio law on causation, the textual indicators that were evident in federal statute in *Paroline* are inapplicable in this case.  Instead, *Paroline* should fall under its self-identified category of "special context" and not viewed as instructive precedent for interpreting the involuntary manslaughter statute going forward.  *Paroline* at 458.

{¶ 34}  The second justification often cited for applying the "substantial factor" test are cases that concern multiple causes that contribute to the death.  In such instances, Ohio courts have often found that the "substantial factor" test should be applied in lieu of a but-for causation analysis.  *See*, *e.g.*, *Hall* at ¶ 72, 76 (finding the mother's conviction for involuntary manslaughter was not against the manifest weight of the evidence because, while the fire was the most substantial factor in causing the death of the defendant's children, the mother's decision to leave her children home alone was also a substantial factor and cause-in-fact of the children's death); *State v. Platt*, 4th Dist. No. 22CA2, 2024-Ohio-1330, ¶ 42 (finding appellant's conduct constituted a substantial factor in bringing about the victim's death as had he kept watch of the children, or locked his gun cabinet, the child "could not have retrieved the loaded gun that ended with a fatal tragedy"); *State v. Wilson,* 10th Dist. No. 03AP-592, 2004-Ohio-2838, ¶ 15-41 (concluding that a jury could have reasonably found that the victim's death was the direct and proximate result of defendant's actions where death, in part, resulted from prescribed drugs in her system nine months after the defendant had set her on fire).  However, such a deviation from the standard "but-for" causation analysis should only be done in "rare" instances.  *Hall* at ¶ 72.

{¶ 35}  In involuntary manslaughter cases derived from a mixed-drug overdose, several Ohio courts have signaled their support that the "substantial factor" test should apply.  However, most of these cases do not, in fact, apply the "substantial factor" test but

instead resolve the assignment of error based on some form of "but-for" causation rationale. *See Womack* at ¶ 44 (finding that because one of the drugs provided to the decedent, carfentanil, was sufficient to have caused the death alone, there was evidence of "but-for" causation to support the involuntary manslaughter conviction); *State v. Price*, 8th Dist. No. 107096, 2019-Ohio-1642, ¶ 43 (finding no abuse of discretion in instructing the jury as "it appears that the trial court's instructions set forth a 'but-for' test that Price sought"); *Williams* at ¶ 43 (finding no need to consider the "substantial factor" test "as the state established that fentanyl was the but-for cause of death"). The strongest opposition to the application of the "but-for" test in this context has come out of the Second and Third District Courts of Appeals. *See Carpenter* at ¶ 55 (concluding sufficient evidence supported the involuntary manslaughter conviction as the compound containing fentanyl, that was sold by the defendant, was a substantial factor in the victim's death); *State v. Berry,* 3d Dist. No. 14-20-05, 2021-Ohio-1132; *State v. Emerson*, 2d Dist. No. 2015-CA-24, 2016-Ohio-8509.

{¶ 36} We have several concerns with the application of the "substantial factor" test in cases involving mixed-drug overdoses. As evidenced by the unique set of facts in cases that have applied the "substantial factor" test, a deviation from "but-for" analysis, at most, should be reserved for those rare instances. By way of example, in *Platt*, it was evident from the facts that the father failed in multiple ways to protect the child. However, the *Platt* court found that a "but-for" causation analysis could not appropriately resolve the causation question despite the obvious understanding of where the blame should be placed. Here, as we will discuss, there is nothing usual about this type of case, its facts, or the variables at issue in the causation analysis.

{¶ 37} It is a tragic reality that opioid deaths have skyrocketed in recent years. *See*, *e.g.*, Health and Human Services, *Opioid Facts and Statistics*, https://www.hhs.gov/opioids/statistics/index.html (accessed October 25, 2024) (finding 70,630 people died from drug overdoses in 2019). In an overwhelming number of cases, multiple drugs were involved in the overdose. "Approximately 80% of overdose deaths involved one or more opioid, and [illicitly manufactured fentanyl ("IMF") was] involved in three of four opioid-involved overdose deaths. IMFs, heroin, cocaine, or methamphetamine (alone or in combination) were involved in 83.8% of overdose deaths." Julie O'Donnell, et al., *Vital Signs: Characteristics of Drug Overdose Deaths Involving Opioids and*

*Stimulants — 24 States and the District of Columbia, January–June 2019,* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7470457/ (accessed October 25, 2024).

{¶ 38} As a result of the opioid epidemic, legal scholars have posited that there is a growing body of evidence that many prosecutors believe bringing drug-induced homicide cases, and like charges, will provide a social and moral response to overdose deaths. Taleed El-Sabawi, Jennifer J. Carroll, and Morgan Godvin, *Drug-Induced Homicide Laws and False Beliefs about Drug Distributors: Three Myths that are Leaving Prosecutors Misinformed*, 60 Am.Crim.L.Rev. 1381, 1385 (2023). In such cases, the state views these prosecutions as an opportunity to "hold[] the dealer accountable[] and tak[e] into consideration that often a user is helpless to stop." *Id.*

{¶ 39} Apparently, the state is now prosecuting not only dealers but addicts acting as intermediaries to drug transactions. The facts of this case should not be lost in this analysis. Seymour was convicted of assisting the purchase of the heroin by arranging Alsey's drug buy with the dealer and then driving the decedent to the dealer's house. There is good reason to believe much of this behavior was derived from Seymour's own struggles with heroin as she admitted to Detective Deskins that she helped with these transactions for a small fee or cut of the drugs as payment for her services. According to Deskins, Seymour would receive "part of the drugs as payment to support her habit." (Tr. Vol. I at 198.) Because Alsey purportedly did not get as much heroin as he anticipated, the decedent compensated Seymour for her efforts by providing some antifreeze for her vehicle.

{¶ 40} In any case, despite the state's obvious motivation to bring these types of cases, demonstrating causation has proven difficult. "Obtaining proof beyond a reasonable doubt that the charged drug distribution was a 'but-for' cause of the purchaser's death has become the single greatest impediment to 'charging the death' under the statute." Rachel Rothberg and Kate Stith, *SYMPOSIUM: Law and the Opioid Crisis: The Opioid Crisis and Federal Criminal Prosecution*, 46 J.L.Med. & Ethics 292, 296-97. This can be explained as many of these cases involve multi-substance toxicity, where heroin or other illegal drugs are found to be a "contributing" factor in the overdose, but not necessarily a "but-for" cause. *Id.* at 305.

{¶ 41} Despite the difficulty in proving "but-for" causation in mixed-drug overdose cases, we are generally able to identify the drugs that encompass the causation analysis and utilize expert witnesses to determine what role each drug played in the decedent's death.

This high hurdle in demonstrating cause-in-fact of death in mixed-drug overdose cases, however, is not a reasonable justification to water down the requirements for proving actual causation. If Ohio courts continue to apply the "substantial factor" test in this context, we risk intensely unpredictable results. Much of the outcome under this test turns on an individual's interpretation of the word "substantial." As one legal scholar pointed out, the "substantial factor" "test offers no real guidance for determining when a factor is substantial or even a 'factor.' " David A. Fischer, *Insufficient Causes*, 94 KY.L.J. 277, 280-81 (2005-06). Other legal scholars have reached a similar conclusion:

> The ambiguity surrounding the substantial factor test leads to inconsistent results, at least across jurisdictions. More importantly, the test gives no clear guidance to the factfinder about how one should approach the causal problem. It also permits courts to engage in fuzzy-headed thinking about what sort of causal requirement *should* be imposed on plaintiffs, especially in cases that present complications in the availability of [causal] evidence.

(Emphasis sic.) Joseph Sanders, Michael D. Green, & William C. Powers, Jr., *The Insubstantiality of the "Substantial Factor" Test for Causation*, 73 MO.L.REV. 399, 430 (2008).

{¶ 42} As evidenced by the disparity in how our sister districts have analyzed this issue, jurisdictions that invoke "substantial factor" tests differ widely in their application creating uncertainty as to how much of a contribution is required to demonstrate actual causation. "Is it sufficient that use of a drug made the victim's death 50 percent more likely? Fifteen percent? Five? Who knows. Uncertainty of that kind cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend." *Burrage* at 218.

{¶ 43} There is good reason to believe Ohio should depart from the "substantial factor" test altogether. It is well settled that Ohio law generally defines "cause" in criminal cases identically to the definition of "proximate cause" in civil cases. *See, e.g., Carpenter* at ¶ 51. As such, we can look to new developments in tort law for guidance. In recent years, courts and commentators have moved away from the "substantial factor" test in tort law based on its lack of certainty. Aaron Twerski & James Henderson, *Torts: Cases and Materials* 232 (2d Ed.2008) ("The [Third] Restatement has wisely rid itself of the substantial factor test. * * * [T]he substantial factor test caused confusion. * * * Few will mourn the passing of the 'substantial factor' test"); David W. Robertson, *The Common*

*Sense of Cause in Fact*, 75 TEX.L.REV. 1765, 1779-80 (1997). Other states have begun to abandon the substantial contributing factor analysis and adopt forms of "but-for" causation analysis. *See, e.g., Doull v. Foster*, 487 Mass. 1 (2021) (finding the traditional "but-for" factual causation standard should apply in most cases, including those with multiple alleged causes, as the "substantial factor" test proved needlessly confusing). Given the potential uncertainty in the application of the "substantial factor" test, as well as the shift away from the test in the civil context, we find the traditional "but-for" test the appropriate lens to review actual causation in this case.

{¶ 44} It is the view of this court that the plain language of R.C. 2925.02(A)(3) and 2903.04(A) require the application of the "but-for" test to determine actual causation. However, if we are to accept that there is some ambiguity in the statute that reasonably permits the use of the "substantial factor" test, we must alternatively consider whether the application of the rule of lenity is warranted. As codified in R.C. 2901.04(A), the rule of lenity provides that "[e]xcept as otherwise provided in division (C) and (D) of this section, sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." As the Supreme Court of Ohio has stated, "the function of this rule is to prevent a court from 'interpret[ing] a criminal statute so as to increase the penalty it imposes on a defendant if the intended scope of the statute is ambiguous.' " *State v. Pendergrass*, 162 Ohio St.3d 25, 2020-Ohio-3335, ¶ 25, quoting *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, ¶ 38. As set forth previously, Ohio district courts are largely divided as to whether the statute requires the use of the "substantial factor" test or "but-for" test to address actual causation. As there is no sound textual argument to resolve the ambiguity concerning the intended scope of the statutes, at minimum, the rule of lenity requires us to apply the friendlier test to the accused.

{¶ 45} Going forward, nothing precludes the General Assembly from providing clarity as to whether courts should reexamine the type of causation to apply in involuntary manslaughter cases. This court will not, however, endorse the less demanding "substantial factor" test without a clear mandate to do so. It is not the role of this court to "criminalize an act simply because the court deems that act of equal atrocity, or of kindred character, with those which are enumerated." (Citations omitted.) *Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting).

{¶ 46} Moving to the application of the "but-for" test to the facts of this case, we must resolve how to appropriately frame the analysis. The state argues that if this court determines that a "but-for" test of actual causation should be applied, the appropriate question under *Burrage* is not " 'Would [the decedent] have died from the heroin alone?' Rather, the question is 'Would [the decedent] have lived without the heroin?' " (Appellee's Brief at 35.)[1] As we have already discussed, *Burrage* concerns a federal sentencing statute and is not binding on this court. Instead, we will examine the question consistent with the standard phrasing under Ohio law. While this matter concerns a bench trial, it is instructive to look to the Ohio Jury Instructions ("OJI"), which aligns with the *Black's Law Dictionary* definition, *see* supra ¶ 20, for guidance. *See State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 97 (Lanzinger, J., dissenting) (writing that while the OJI are not binding legal authority, they are helpful as an example of the generally accepted interpretation of Ohio law). The OJI defines "cause" as "an act or failure to act that in a natural and continuous sequence directly produces the (death) * * *, and without which it would not have occurred." OJI CR Section 417.23. The language, "without which it would not have occurred," captures "but-for" causation. *Williams* at ¶ 35. Stated another way, actual causation is established when "but-for" "the act" (facilitating the purchase of the heroin), it (death) "would not have occurred."

{¶ 47} In the case sub judice, we cannot say that heroin was the "but-for" cause of death. Dr. Jenkins testified that the decedent's cause of death was the combined ingestion of heroin, kratom, Ritalin, and Benadryl. (Tr. Vol. II at 326.) When asked if he could "single out a drug that was more responsible than the others" as the cause of death, Dr. Jenkins replied, "[n]o I cannot." (Tr. at 327.) Dr. Jenkins explained that the drugs "worked together to cause the death." (Tr. at 327.) Dr. Jenkins, however, declined to adopt the statement that the victim would still have died if any one of the four drugs had not been present in his system. (Tr. at 336.) While Dr. Jenkins concluded that none of the drugs were the "primary" cause of death, each of the drugs "contributed" to the death. (Tr. at 335-36.) On cross-examination, Dr. Jenkins stated that he could not say whether "heroin alone" caused

---

[1] We note that there is some reason to believe the state's framing of the *Burrage* causation inquiry is incorrect as the question at issue in *Burrage* was "whether the use of heroin was the actual cause of [the victim's] *death* in the sense that §841(b)(1)(C) requires." (Emphasis added.) *Burrage* at 210. Because Ohio law controls, however, we decline to address this issue.

the victim's death or serious physical harm, nor could he be certain that the victim "would not have died" but for the use of kratom, Ritalin, or Benadryl. (Tr. at 347-48.) Therefore, reviewing the evidence in a light most favorable to the state, as required under a sufficiency of the evidence analysis, the state has failed to demonstrate that heroin was the actual cause of the victim's death. While it could be argued that heroin was the most dangerous drug and was the only drug the victim had avoided for years, it is ultimately irrelevant to the analysis. There is no debate that heroin is an exceedingly dangerous substance, the question at issue is what was the actual cause of death? Here, no witness provided testimony that heroin was the "but-for" cause of the decedent's overdose. Without such evidence, we cannot find that the requisite elements were met.

{¶ 48} The state, citing language from *Burrage,* argues that "but-for" causation can be satisfied when " 'the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so.' " (Appellant's Brief at 25, 34, quoting *Burrage* at 211.) Upon review, we do not agree that there was sufficient evidence to support the conclusion that the heroin in this case was the so called "straw that broke the camel's back." *Id.* Dr. Jenkins testified that he could not say that "heroin alone" caused the victim's death or even serious physical harm. When asked whether Alsey would still have died if any one of the four drugs was removed from the mixture, Dr. Jenkins declined to make such a claim. (Tr. at 336.) Furthermore, Dr. Jenkins could not be certain that the victim "would not have died" but for the use of kratom, Ritalin, or Benadryl. (Tr. at 347-48.) Dr. Jenkins explained that none of the four drugs could be singled out as a primary cause of death but that all four drugs "worked together to cause the death." (Tr. at 335.) This is analogous with the testimony in *Burrage* as two medical experts agreed that the victim overdosed with multiple drugs in his system and concluded that the heroin at issue in the case was merely a "contributing" factor. *Burrage* at 207. "The heroin, in other words, contributed to an overall effect that caused [the victim] to stop breathing." *Id.* Therefore, we cannot reasonably conclude that there was sufficient testimony to show that the heroin in this case "was the straw that broke the camel's back." *Burrage* at 211-12.

{¶ 49} For the forgoing reasons, Seymour's first and second assignments of error are sustained.

## IV. CERTIFIED CONFLICT

{¶ 50} We recognize that our decision today is directly in conflict with the Third

District Court of Appeals decision in *Carpenter*. Therefore, we sua sponte certify a conflict as to the following question:

> Whether there is sufficient evidence to support convictions for involuntary manslaughter under R.C. 2925.02(A)(3) and corrupting another with drugs under R.C. 2903.04(A) when the use of the controlled substance was a contributing, but not a "but-for," cause of the mixed-drug overdose death.

## V. CONCLUSION

{¶ 51} Having sustained appellant's first and second assignments of error, we reverse the judgment of the Franklin County Court of Common Pleas. Appellant's convictions for involuntary manslaughter and corrupting another with drugs are vacated and this case is remanded to the trial court for further proceeding consistent with this decision. We also sua sponte certify a conflict between our analysis of appellant's first and second assignments of error and *Carpenter*.

*Judgment reversed;*
*convictions vacated;*
*cause remanded.*

BEATTY BLUNT, J., concurs.
LELAND, J., dissents in part, concurs in part.

LELAND, J., dissenting in part and concurring in part.

{¶ 52} Although I agree with the majority's decision to certify a conflict with *State v. Carpenter*, 3d Dist. No. 13-18-16, 2019-Ohio-58, a decision of the Third District Court of Appeals, I dissent from the majority's decision vacating appellant's convictions.

{¶ 53} The role of this court in deciding whether the evidence was sufficient to support appellant's convictions is to examine " 'the evidence in a light most favorable to the prosecution' " and then determine whether " 'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 45, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Edmonds*, 8th Dist. No. 104528, 2017-Ohio-745, ¶ 33, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). I would faithfully apply this standard and conclude the evidence was sufficient for a reasonable trier of fact to conclude the heroin acquired through appellant caused Alsey's death.

{¶ 54} A defendant in Ohio may be held criminally responsible even in cases "where the defendant's conduct combined with other occurrences to jointly result in a legal injury." *State v. Hall*, 12th Dist. No. CA2015-11-022, 2017-Ohio-879, ¶ 72. In the event multiple proximate causes yield a single injury, the state can still prove actual causation if: "(1) the defendant's conduct was a 'substantial factor' in bringing about the harm, and (2) there is no other rule of law that relieves the defendant of liability." *Id.* at ¶ 73, quoting *State v. Filchock*, 166 Ohio App.3d 611, 2006-Ohio-2242, ¶ 77 (11th Dist.), *State v. Flanek*, 8th Dist. No. 63308 (Sept. 2, 1993); *State v. Emerson*, 2d Dist. No. 2015-CA-24, 2016-Ohio-8509, ¶ 24; and Lafave & Scott, *Criminal Law*, Section 35, 250 (1972). Here, because Alsey's death certificate listed four drugs as his cause of death, I would determine actual causation based on the substantial factor test rather than the but-for standard. *See Hall* at ¶ 72, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981); *Taylor v. Webster*, 12 Ohio St.2d 53, 56 (1967), and *State v. Dunham*, 5th Dist. No. 13CA26, 2014-Ohio-1042, ¶ 48; *see also State v. Crockett*, 10th Dist. No. 14AP-242, 2015-Ohio-2351, ¶ 45, fn. 1, quoting *State v. Beaver*, 119 Ohio App.3d 385, 394 (11th Dist.1997) (" 'The injuries inflicted by the defendant need not be the sole cause of death, as long as they constitute a substantial factor in the death.' "). Although the majority devotes much of its analysis to *Burrage v. United States*, 571 U.S. 204 (2014), and *State v. Kosto*, 5th Dist. No. 17 CA 54, 2018-Ohio-1925, I agree with its ultimate conclusion that neither *Burrage* nor *Kosto* is controlling precedent for the present case.

{¶ 55} While most Ohio case law indicates the substantial factor test should apply here, the state presented sufficient evidence even under the but-for standard. A reasonable interpretation of the facts provides a sufficient basis for a factfinder to conclude heroin was the but-for cause of Alsey's death—after all, Alsey had ingested Benadryl, Ritalin, and kratom with some regularity, but he died only upon the introduction of heroin into his system. The testifying medical experts in this case, however, equivocated on whether heroin caused Alsey's death, even though the immediately mortal effect of the heroin was plain to see. Such ambiguity may be laudable in the context of the scientific method, but when a court is obligated to make concrete decisions about the cause of a crime—here, a crime resulting in death—it cannot neglect the facts in the record. Given the facts before us, it is difficult to conjure a metaphor more apt than the straw that broke the camel's back— Alsey was going about with Benadryl, Ritalin, and kratom in his system, and he was alive.

Within minutes or hours of injecting heroin, Alsey died. His heroin paraphernalia was discovered close at hand. This would amount to but-for causation, were that standard to apply. Regardless, I agree with the overwhelming majority of Ohio courts; the substantial factor test applies in drug overdose cases in which multiple drugs inflict a single injury.

{¶ 56} The state presented evidence sufficient for a rational trier of fact to find appellant's "conduct was a 'substantial factor' in bringing about the harm" done to Alsey. *Hall* at ¶ 73; *see Nichols* at ¶ 45. Dr. Jenkins testified "each of the drugs," heroin included, proximately caused and contributed to Alsey's death. (Tr. Vol. II at 336.) He also noted that in general, heroin is the most common primary cause of death in overdose cases—contrastingly, it was "[e]xtremely rare" for Benadryl and "very rare" for Ritalin to be the primary cause of overdose deaths. (Tr. Vol. II at 336-37.) While Dr. Jenkins noted that overdose cases involving kratom are "becoming more common," he acknowledged he knew of no scientific studies on kratom in particular. (Tr. Vol. II at 337.) Baker, the chief toxicologist at the Franklin County Coroner's Office, attested the level of morphine in Alsey's blood was "typical" of a heroin-related death. (Tr. Vol. III at 376.) By his own account, Baker also "very conservatively" estimated Alsey took the heroin within five hours of his death. (Tr. Vol. III at 374.) Furthermore, Alsey's mother Lisa testified that when appellant dropped Alsey off at home, he did not appear to be under the influence of heroin and that based on her prior experience with his heroin use, she could "tell the difference." (Tr. Vol. I at 62.) By her testimony, about an hour after she observed his apparent sobriety, Alsey was dead. The record thus contains evidence Alsey died within an hour of injecting heroin.

{¶ 57} The state also presented evidence suggesting Alsey regularly took three of the drugs listed as his cause of death—kratom, Benadryl, and Ritalin—while, on the other hand, he appears to have abstained from heroin use for roughly two years leading up to his death. Lisa testified, for example, that Alsey took kratom by mixing the powder into his tea or coffee. The record also included text messages in which Alsey thanked his mother for giving him kratom, expressing to her that the new type of kratom she provided was his favorite. As to the Benadryl, text messages indicated Alsey used it to fall asleep and had access to the medicine cabinet where it was kept. Further, Alsey repeatedly asked his mother for Ritalin or similar drugs via text message, though Lisa refused to answer questions at trial about how he acquired the drug. In contrast to his apparent use of kratom, Benadryl, and Ritalin

on a recurring basis, Alsey had no such recent history of heroin use. Of the four drugs that caused Alsey's death, heroin was the most dangerous, and it was also the only one he intentionally avoided for years due to his addiction and overdose history.

{¶ 58} Thus, " 'viewing the evidence in a light most favorable to the prosecution,' " I maintain the state presented evidence sufficient for a rational trier of fact to find beyond a reasonable doubt that appellant's provision of heroin to Alsey was a substantial factor in bringing about his death. *Nichols* at ¶ 45, quoting *Jenks* at paragraph two of the syllabus; *see Carpenter*, 2019-Ohio-58, at ¶ 55. Specifically, based on Lisa's testimony that Alsey spoke with her and appeared sober just one hour before she discovered his body, a rational trier of fact could readily conclude appellant's procurement of the heroin that Alsey injected in the basement was a substantial factor in his death. I would conclude the evidence is sufficient to support a finding of actual causation.

{¶ 59} On a separate note, the majority draws attention to appellant's own addiction to heroin and questions the wisdom of prosecuting "not only dealers but addicts acting as intermediaries to drug transactions." (Majority opinion at ¶ 40.) I certainly sympathize with the difficulties that led appellant to serve as an intermediary in heroin transactions. Unfortunately, however, appellant's personal history does not change the fact that her procurement of heroin for Alsey was at least a substantial factor in causing his death. As challenging as a criminal defendant's personal circumstances may be, it remains this court's duty to apply criminal statutes as written. The government has an indisputably valid interest in punishing those who cause the death of another, whatever the status of the alleged perpetrator's own drug addiction.

{¶ 60} Because I would conclude the evidence is sufficient for a reasonable trier of fact to find appellant's actions caused Alsey's death, I respectfully dissent. And, though I continue to believe the evidence is sufficient to support a finding that appellant's role in Alsey acquiring heroin was a but-for cause of his death, I concur with the majority's certification of a conflict with the decision of the Third District Court of Appeals in *Carpenter*.

_____