[Cite as *State v. Keaveney-Padamonsky*, 2025-Ohio-5285.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-L-024 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| SKYLER M. KEAVENEY-PADAMONSKY, | Trial Court No. 2023 CR 000504 |
| Defendant-Appellant. | |

## OPINION AND JUDGMENT ENTRY

Decided: November 24, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, *Teri R. Daniel* and *Laurence D. Giegerich*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Jay F. Crook*, Jay F. Crook, Attorney at Law, LLC, 37903 Euclid Avenue, Willoughby, OH 44094 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Skyler M. Keaveney-Padamonsky, appeals the judgment of conviction entered by the Lake County Court of Common Pleas on one count of involuntary manslaughter, one count of corrupting another with drugs, two counts of felonious assault, one count of drug trafficking, and one count of possession of criminal tools. The first two counts relate to the death of the victim and form the basis of the instant appeal. At issue is (1) whether the trial court committed plain error in allowing expert testimony regarding foundational aspects of the testimony without inquiring into the

reliability of the evidence and/or conducting a *Daubert* hearing, and (2) whether trial counsel was ineffective for failing to object to or cross-examine the State's expert witnesses regarding the source of information used in preparing a toxicology report upon which each relied. We affirm.

{¶2} On April 22, 2023, the victim, a 23-year-old male, overdosed in Mentor, Ohio. In his belongings, investigators found two cell phones and a collection of blue pills. Emergency responders attempted to revive the victim at the scene; the victim could not be revived and was transferred to the hospital. The victim never regained consciousness and was pronounced dead.

{¶3} Blood was drawn from the victim's body by the Lake County Coroner's Office. The samples were sent to Axis Forensic Toxicology ("Axis"), an independent, private laboratory, for testing. After receiving the results from Axis, Dr. David Keep, a pathologist with the Lake County Coroner's Office, concluded the victim died of the combined effects of a mixture of multiple drugs. Of the various drugs, Dr. Keep determined a lethal concentration of fentanyl caused the victim's death.

{¶4} Using the victim's cell phone records, the Lake County Narcotics Agency arranged an undercover buy from the person suspected of supplying the drugs to the victim. The dealer, later identified as appellant, was determined to have engaged in three previous drug transactions with the victim. Appellant arrived in his vehicle, believing he was meeting with the victim, but was blocked by undercover agents in unmarked cars. Appellant attempted to flee in his vehicle and, in the process, struck two unmarked cars, injuring one agent. Appellant was eventually arrested and blue pills, similar to those found in the victim's belongings, were found in his possession.

{¶5} The blue pills found in the victim's belongings and those found on appellant were sent to the Lake County Crime Laboratory for testing. The pills appeared similar and contained the same makeup of ingredients, one being fentanyl.

{¶6} Appellant was indicted on six counts: one count of involuntary manslaughter, a felony of the first degree, in violation of R.C. 2903.04(A); one count of corrupting another with drugs, a felony of the second degree, in violation of R.C. 2925.02(A)(3); one count of trafficking in a fentanyl-related compound, a felony of the fifth degree, in violation of R.C. 2925.03(A)(1); two counts of felonious assault, felonies of the first degree, in violation of R.C. 2903.11(A)(2); and one count of possessing criminal tools, a felony of the fifth degree, in violation of R.C. 2923.24.

{¶7} The matter proceeded to jury trial, and appellant was found guilty on all counts. The trial court imposed an indefinite term of imprisonment of 24 to 29 years. Appellant now appeals assigning two errors. His first assignment of error provides:

{¶8} "The trial court committed plain error when it allowed expert testimony as to the 'reference range' of harmful/lethal levels of fentanyl that were internally created by a testing lab without holding a hearing or having any foundation for the conclusions testified to by the expert."

{¶9} Under this assignment of error, appellant claims the trial court committed plain error by permitting the State to introduce evidence of a "reference range" relating to the lethality of fentanyl where the "reference range" was obtained through a third-party source and there was no evidence of peer review, scientific scrutiny, data collection methods, or any other indicia of reliability. Appellant maintains the source at issue was

Case No. 2025-L-024

hearsay and there is no exception that would permit the evidence. No objection to the evidence was leveled at trial. Hence, we review the issue for plain error.

{¶10} "'The law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted.'" *Lester v. Leuck*, 142 Ohio St. 91, 92 (1943), quoting *State v. Kollar*, 93 Ohio St. 89, 91 (1915). Although the foregoing quote pertained to a party's commission of invited error, it stands to reason it would apply to an appellate court's application of plain error. *See State v. Thompson*, 2020-Ohio-67, ¶ 129 (11th Dist.) (Trapp, J., concurring in part, dissenting in part).

{¶11} In *State v. Barnes*, 2002-Ohio-68, the Supreme Court of Ohio set forth strict limitations on what constitutes plain error. "First, there must be an error, i.e., a deviation from a legal rule." (Citations omitted.) *Id.* at ¶ 20. "Second, the error must be plain," i.e., "the error must be an 'obvious' defect in the proceedings." (Citations omitted.) *Id.* "Third, the error must have affected 'substantial rights.'" *Id.* The defendant has the burden of demonstrating plain error. *State v. Payne*, 2007-Ohio-4642, ¶ 17. Courts proceed with great reluctance in employing a plain error analysis in cases that would require the trial court to advocate on behalf of the defendant. *State v. Barnes*, 2013-Ohio-2836, ¶ 41 (11th Dist.).

{¶12} In this matter, the State called Stuart Kurtz, a toxicologist from Axis Forensic Toxicology, to testify regarding the levels of drugs found in the victim's blood, which was extracted post-mortem. Axis Forensic Toxicology is a private company that provides

Case No. 2025-L-024

forensic analyses on standard drugs of abuse as well as comprehensive testing on prescription drugs and over-the-counter medicines that may not be included in the "drugs-of-abuse" category.

{¶13} In this case, Mr. Kurtz received blood drawn from the victim's femoral artery which he described as a "peripheral source" of blood that provides a more accurate "snapshot" of drug concentration at the time of death. Dr. Keep, the pathologist who conducted the autopsy, corroborated Mr. Kurtz's testimony regarding the validity of peripheral-source-femoral blood.

{¶14} Mr. Kurtz's report indicated there were multiple drugs that were found in the victim's blood, including amphetamine (a stimulant), lamotrigine (an anticonvulsant), pregabalin (an anticonvulsant), bupropion (an antidepressant), 4-ANPP (a "designer" opioid prepared by an illicit manufacturer), 6-Beta-Naltrexol (an opioid analgesic), naloxone (an opioid analgesic), fentanyl (an opioid analgesic), norfentanyl (an opioid analgesic), zopiclone (a sedative), caffeine (a stimulant), and cotinine (a stimulant). Each drug that was tested had an associated "qualitative result," i.e., whether it was positive or negative. Each drug also had a "quantitative result," i.e., the amount of concentration of the drug in the specimen.

{¶15} Additionally, the report included a "reporting limit" for each drug. Mr. Kurtz testified the "reporting limit" is the threshold amount Axis uses to report a drug "positive" or "negative." In other words, Mr. Kurtz stated, if the specimen tests above the "reporting limit," it is deemed positive, if it falls below the limit, it is negative.

{¶16} Finally, the report included a "reference range" for each drug that was above the "reporting limit." According to Mr. Kurtz, the "reference range" is used as a means to

Case No. 2025-L-024

determine whether the amount which tested above the "reporting limit" is in a therapeutic range (an amount prescribed by a physician) or beyond that limit. Mr. Kurtz elaborated:

> These ranges on our paper[, the report,] are derived from a paper that we reference at the bottom of page 3 [of the report]. It's important to note that therapeutic ranges are done in very controlled clinical trials where individuals are given a set dose of a drug at a time. This time is known, the dose is known, and then at various intervals after the dose is given, their blood is sampled in order to determine what the concentration is.
>
> So these are ranges that are applicable in clinical settings more so than post-mortem settings. We provide them in post-mortem settings as a starting point to determine what role these drugs may have played in an individual's death.[1]

{¶17} Regarding the "reference range," Mr. Kurtz underscored that even if a number is above the therapeutic range, this does not imply that the concentration of the drug was at a toxic level or even that it played a role in an individual's death. To this point, Mr. Kurtz testified that the only drug that rose to the level of a toxic or deadly level was the amount of fentanyl in the victim's system. He testified that each of the other drugs, even in combination with one another, did not create a concentration that would be considered toxic.

{¶18} With this backdrop in mind, appellant argues that the "reference range" derived from the paper at issue (creating a "reference range") was improperly admitted because both the range and the paper are inadmissible hearsay. Appellant asserts there is no evidence, other than Mr. Kurtz's use of the "reference range," to support his conclusion that the fentanyl concentration was a fatal dose. He maintains its admission was prejudicial plain error. We do not agree.

---

1. The paper cited for the "reference ranges" was obtained from "Schulz M, Iwersen-Bergmann S, Andresen H, Schmoldt A. Therapeutic and toxic blood concentrations of nearly 1,000 drugs and other xenobiotics. Crit Care. 2012; 16(4):R136. Published 2012 Jul 26. Doi:10.1186/cc11441[.]"

Case No. 2025-L-024

{¶19}  Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Appellant submits, and we agree, that the paper used to establish the "reference range" represents hearsay evidence. Appellant, however, maintains that no hearsay exception applies to the paper in question. We do not agree with this assertion. Although no hearing was held regarding the admissibility of the paper upon which Mr. Kurtz relied to testify to "reference ranges," we conclude the paper would reasonably fall within the hearsay exception defined by Evid.R. 803(18).

{¶20}  Evid.R. 803(18), Ohio's "learned-treatise exception," provides that hearsay evidence is admissible:

> To the extent called to the attention of an expert witness upon cross-examination *or relied upon by the expert witness in direct examination*, statements contained *in published treatises, periodicals, or pamphlets on a subject of* history, *medicine, or other science* or art, *established as a reliable authority by the testimony or admission of the witness* or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

(Emphasis added.)

{¶21}  The comments of Evid.R. 803(18) point out:

> There are a number of reasons for creating a hearsay exception for statements in learned treatises under the circumstances in the . . . rule. Every expert brings a certain amount of "background hearsay" to his or her opinion, in the form of the out-of-court statements of textbook authors, colleagues, and others, that forms much of the basis of the expert's training and education.

Citing Paul Gianelli, Understanding Evidence 347 (2003). The comments further provide that "[a]uthors of scholarly works usually have no connection to the litigation and no

Case No. 2025-L-024

motive to misrepresent. Their scholarly reputations are at stake when peers review their work for accuracy, enhancing reliability. With respect to necessity, there is often no other way to get the opinions of the most highly qualified researchers and scholars before the court." Moreover, "statements in learned treatises come to the trier of fact only through the testimony of qualified experts who are on the stand to explain and apply the material in the treatise." *Id.*

{¶22} Here, there was no objection to Mr. Kurtz's qualifications to testify as an expert in toxicology. Moreover, as quoted above, Mr. Kurtz provided a foundation for his reliance on the data regarding drug concentration "reference ranges." Although appellant takes issue with the arguable reliability of the paper upon which the "reference ranges" were derived, Mr. Kurtz's explanation that "reference" or "therapeutic ranges" are established through "very controlled clinical trials" where individuals are given a known dose at a known time, and samples are extracted at specific intervals to monitor concentration. Accordingly, the paper upon which Mr. Kurtz relied, and which is specifically cited in his report, can be reasonably deemed a learned treatise. In this respect, we reject appellant's plain-error challenge.

{¶23} Moreover, even if the learned-treatise exception to the hearsay rule did not apply, there is a separate reason for concluding that the admission of the purported hearsay does not rise to plain error.

{¶24} Dr. Keep testified he relied upon the Axis report relating to the drug concentrations in the victim's blood. Dr. Keep, however, stated he was not familiar with Axis' or Mr. Kurtz's use of the term "reference range." As such, he testified he did not "*place any significance on [Axis'] reference range*." (Emphasis added.)

Case No. 2025-L-024

{¶25} Dr. Keep testified that "[t]he [f]entanyl level in this particular case is a high level . . . ." He stated that an opiate, such as fentanyl in this case, is used therapeutically to reduce pain, but has very dangerous side effects, e.g., "central nervous system or brain depression, and what I mean by that, I don't mean sad or unhappy, just decreased function of the brain." Dr. Keep stated that when there is a significant level of an opioid, one can have decreased breathing to the point one might stop breathing, upon which a chain reaction occurs: the lungs stop working and the heart stops working.

{¶26} Considering these general points, Dr. Keep testified that his physical examination of the victim's body supported his conclusion that the victim died by accidental overdose by way of fentanyl. Specifically, the doctor noted the victim had pulmonary congestion and edema, i.e., the "backing up" of blood. Dr. Keep emphasized that this phenomenon is "very, very common in drug overdose deaths." He further found the victim had "acute bronchopneumonia" or inflammation of the lung tissue, another sign of death due to drug toxicity. Dr. Keep also found cerebral edema or "swelling of the brain" which is also common in drug deaths.

{¶27} Dr. Keep acknowledged the presence of the multiple drugs and their concentrations but concluded that the only concentration that gave him concern was the level of fentanyl. He testified, like Mr. Kurtz, that the concentrations of the other drugs in the victim's blood were at a non-toxic level; however, the concentration of fentanyl in the victim's blood is at "a significantly high level."

{¶28} Dr. Keep's testimony reveals that, irrespective of the introduction of the evidence relating to the "reference ranges" derived from the challenged paper at issue, he principally, if not solely, relied upon the concentration levels enumerated in the Axis

Case No. 2025-L-024

report to which Mr. Kurtz testified. For plain error to occur, the alleged error must affect a defendant's "substantial rights," i.e., the alleged error must have affected the outcome of the trial. *State v. Tench*, 2018-Ohio-5205, ¶ 217-218. An appealing party must therefore demonstrate a reasonable probability that the error resulted in prejudice. *Id.* at ¶ 218. Regardless of our principal conclusion that the paper at issue was a learned treatise, we additionally maintain the introduction of the evidence did not affect appellant's substantial rights because Dr. Keep's testimony demonstrates he did not rely upon the "reference range" data to support his conclusion that the victim's death was a result of a drug overdose induced by a toxic level of fentanyl. Any purported error in admitting testimony regarding the reference range did not affect the outcome of the trial. Appellant's claim of plain error is therefore unavailing.

{¶29} Finally, although only peripherally raised under appellant's assignment of error, he additionally appears to argue there was insufficient evidence to support the conviction for felony-one involuntary manslaughter.[2] For a comprehensive analysis, we shall consider this issue.

{¶30} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 1997-Ohio-52, ¶ 23, quoting *Black's Law Dictionary* (6th Ed. 1990). The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential

_____

2. Appellant argues that there was insufficient evidence to support the conviction for involuntary manslaughter by way of corrupting another with drugs because the State failed to establish that fentanyl was the "but-for" cause of death.

Case No. 2025-L-024

elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶31}   When considering the sufficiency of the evidence, a reviewing court does not consider its credibility or effect in inducing belief. *Thompkins* at ¶ 23. Rather, an appellate court decides whether, if believed, the evidence can sustain the verdict as a matter of law. *State v. Richardson*, 2016-Ohio-8448, ¶ 13. This accordingly requires a review of the elements of the charged offenses in relation to the State's evidence. *Id.*

{¶32}   Appellant was charged with involuntary manslaughter, in violation of R.C. 2903.04(A), which provides: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

{¶33}   The predicate felony in this matter is the charge of corrupting another with drugs, in violation of R.C. 2925.02(A)(3), which provides, in relevant part: "No person shall knowingly do any of the following: . . . By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person . . . ."

{¶34}   In his autopsy report, Dr. Keep concluded the victim died of "[a]cute intoxication by the combined effects of Amphetamine, Bupropion, Fentanyl, Lamotrigine, Pregabalin, and Zopiclone." The doctor testified, however, that the levels of Amphetamine, Bupropion, Lamotrigine, Pregabalin, and Zopiclone did not give him concern because they were all at a non-toxic level.

{¶35}   On cross-examination, defense counsel took issue with Dr. Keep's sequence of the drugs in his report and his conclusion that the victim's death was a result

Case No. 2025-L-024

of the "combined effects" of the various drugs. The doctor did not waver in his conclusion that the concentration of the other drugs was of some scientific or medical relevance; he qualified his conclusion by emphasizing that all of the drugs *except* fentanyl did not rise to a toxic level and were not of great concern to him. With respect to these points, Dr. Keep testified:

> In drug toxicity deaths, drug overdose deaths, most of the time there are a number of drugs that affect the brain. There are cases when there's just one drug. You say acute intoxication by the drug that's there. In cases where there's multiple drugs that play a lot, a little, what I do is put them in alphabetical order. So I start with A, and I ended with Z. I did not prioritize in my cause of death. I didn't put what I thought was the most important drug first, I just put them in alphabetical order.

{¶36} Dr. Keep additionally testified:

> Okay. So you have multiple drugs that act in a similar fashion in that they are a depressant to the brain. They decrease brain function. Now, one of those might be at a much higher level and a more potent drug that would suppress it to a large extent, and you would have a few others that would do the same action to a lesser extent, but they all combined to have the same effect, but one is much more profound in its effect.

{¶37} Dr. Keep maintained that, other than fentanyl, the concentration of all of the drugs present in the victim's system were at a non-toxic level. He also testified that, *but for* the level of fentanyl in the victim's system, under ordinary circumstances, he would be alive.

{¶38} Courts are split regarding the appropriate level of causal proof necessary to establish a conviction for involuntary manslaughter pursuant to the predicate felony offense of corrupting another with drugs. In *State v. Carpenter*, 2019-Ohio-58 (3d Dist.), the appellate court determined "substantial-factor" causation was required to establish the causal link. In *State v. Seymour*, 2024-Ohio-5179 (10th Dist.), the court concluded a

more restrictive, "but-for" causation was required to establish causation. In *Seymour*, the Tenth District certified the following question to the Supreme Court of Ohio:

> Whether there is sufficient evidence to support convictions for involuntary manslaughter under R.C. 2925.02(A)(3) and corrupting another with drugs under R.C. 2903.04(A) when the use of the controlled substance was a contributing, but not a "but-for," cause of the mixed-drug overdose death.

*Seymour* at ¶ 50.

{¶39} The Supreme Court accepted the appeal, and it is currently pending. *See State v. Seymour*, 2025-Ohio-598 (allowing motion to certify and jurisdictional appeal).

{¶40} In this case, under either standard, we hold there was sufficient evidence to establish the victim's death was caused by appellant's act of corrupting another with drugs. There is both sufficient evidence that fentanyl was a substantial factor and sufficient evidence that, but for the victim's consumption of fentanyl, which was furnished by appellant, the victim died.

{¶41} Appellant's first assignment of error lacks merit.

{¶42} Appellant's second assignment of error provides:

{¶43} "Trial counsel [was] ineffective in failing to object to or cross examine expert witnesses on the sources of information used in preparing reports."

{¶44} Under his second assignment of error, appellant argues trial counsel was ineffective for failing to object to the experts' reliance upon an "internally created category" relating to toxicity and lethality of a drug without support for such a classification.

{¶45} "There is a general presumption that trial counsel's conduct is within the broad range of professional assistance." *State v. Andrus*, 2020-Ohio-6810, ¶ 60 (11th Dist.), citing *State v. Bradley*, 42 Ohio St.3d 136, 142-143 (1989). The burden of

establishing ineffective assistance of counsel falls upon the appealing defendant. *State v. Robinson*, 2021-Ohio-1064, ¶ 24 (11th Dist.)

{¶46} "In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell 'below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.'" *Andrus* at ¶ 60, quoting *Bradley,* paragraph two of the syllabus (adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)).

{¶47} Appellant contends that the "reference range" upon which Mr. Kurtz relied was "internally created" by Axis and the record contains "no indicia of reliability" for the range. As discussed above, the "reference range" was premised upon a paper that was cited in the Axis report. Mr. Kurtz explained the basis of the paper and why its data was used while testing the specimen at issue. The paper was not "internally created." Moreover, Mr. Kurtz's testimony regarding the basis for using the data in the paper provided a clear indicium of scientific reliability. Appellant's suggestions are not well-taken.

{¶48} "[T]he prejudice standards for plain error and ineffective-assistance-of-counsel claims are the same . . . ." *State v. Cervantes*, 2022-Ohio-2536, ¶ 58 (3d Dist.), citing *State v. Nurein*, 2022-Ohio-1711, ¶ 60 (3d Dist.); *State v. Rogers*, 2015-Ohio-2459, ¶ 22 (holding that, to establish plain error, "[t]he accused is . . . required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims"). Thus, appellant's failure to establish prejudice under the plain-error standard in his first assignment of error is a

failure to establish prejudice under the ineffective-assistance-of-counsel standard in his second assignment of error.

{¶49} Appellant's second assignment of error lacks merit.

{¶50} The judgment of the trial court is affirmed.


MATT LYNCH, J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2025-L-024

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE MATT LYNCH,
concurs

_____
JUDGE JOHN J. EKLUND,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-L-024